# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| STATE OF CONNECTICUT OFFICE OF : <br> PROTECTION AND ADVOCACY <br> FOR PERSONS WITH DISABILITIES; <br> JAMES MCGAUGHEY, Executive <br> Director, Office of Protection and <br> Advocacy for Persons with Disabilities, <br><br> Plaintiffs, <br><br> v. <br><br> WAYNE CHOINSKI, Warden, <br> Northern Correctional Institution, <br> in his official capacity; <br> GIOVANNY GOMEZ, Warden, <br> Garner Correctional Institution, <br> in his official capacity; and <br> THERESA C. LANTZ, Commissioner, <br> Connecticut Department of Correction, <br> in her official capacity; <br><br> Defendants. | Civil Action No. 3:03CV1352 (RNC) <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> MARCH 8, 2004 |

# SETTLEMENT AGREEMENT

### A.  GENERAL PROVISIONS

1. This settlement agreement is entered into by the parties to resolve all of the claims made in this action, wherein the plaintiffs, Office of Protection and Advocacy for Persons with Disabilities ("OPA") and James McGaughey, bring a number of claims relating to the conditions of confinement of inmates housed at the Northern Correctional Institution and Garner Correctional Institution.

2. In entering this agreement, the parties agree and represent that this agreement is fair, reasonable and adequate to protect the interests of all parties and, with respect to the population served by the plaintiffs, that in the opinion of OPA, entering into this agreement is in the best interests of prisoners and detainees with mental illness, who may develop mental illness, or who are at risk of developing mental illness, who are confined

at Northern CI and Garner CI. The parties further agree and represent that the terms and conditions of this agreement do not constitute "prospective relief" within the meaning of 18 U.S.C. § 3626.

3. This settlement agreement is not to be construed as a Consent Judgment or as an adjudication on the merits of this litigation. The defendants deny the allegations in this lawsuit and do not admit liability. By entering into this settlement agreement, the defendants do not concede that their past policies and practices violate any state or federal laws, deprive any inmates of their state or federal constitutional rights, or were otherwise inadequate. Moreover, the parties acknowledge that the policies and procedures outlined herein do not define clearly established constitutional rights of inmates or create any private right of action against the State of Connecticut, its agents, employees and/or representatives.

4. By entering into this agreement, the defendants do not waive, and are not authorized to waive, the sovereign immunity of the State of Connecticut or the State's immunity from suit guaranteed by the Eleventh Amendment.

5. This settlement agreement is binding upon the plaintiffs, the plaintiffs' successors in office, employees and agents, the defendants named in this lawsuit, and on the defendants' successors in office, employees and agents.

6. Except where otherwise provided, the Defendants shall be obligated to perform their obligations under this settlement agreement upon the date of the filing of the Court's Order of Dismissal of this matter. The date of the filing of the Court's Order of Dismissal shall hereafter be referred to as the "effective date" of the agreement.

7. The parties shall request that the Court, in its Order of Dismissal, incorporate the terms of this Agreement, thereby making "the parties' obligation to comply with the terms of the Settlement Agreement ... part of the order" consistent with the holding in Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 381 (1994). The parties agree that, after the Court issues such an order, it shall have jurisdiction and authority to enforce this Agreement only as set forth in paragraph A.13, and subject to the termination provisions in paragraph B. 17. See Id.; Scelsa v. City University of New York, 76 F. 3d 37, 40 (2d Cir. 1996).

8. Prior to the filing of any motion challenging the adequacy of the defendants' compliance with the terms and conditions of this agreement, the plaintiffs shall first notify the Commissioner of the Department of Correction, defendants' counsel and the appropriate consultants described in paragraph B.17 in writing, detailing the nature of the breach and the proposed remedy, with specific reference to the enumerated paragraphs in this agreement that are alleged to have been breached. The consultants shall meet and confer as soon as possible regarding the claim of noncompliance and shall convey their recommended resolution of the claim to the parties within 30 days of receipt of the claim. If the consultants are unable to agree upon a recommended resolution, they shall select, by mutual agreement and within 15 days, a neutral expert to arbitrate the claim as set

forth in paragraph B.17 and shall convey the resulting recommended resolution of the claim to the parties within 30 days of said neutral expert's receipt of the claim. If the parties do not agree with the consultants' recommended resolution, they shall meet and confer within 10 days of the date of the consultants' recommendation.

9. In the event the defendants do not comply with or are unable to comply with the consultant's recommended resolution within 10 days of the parties' meeting and conference described in paragraph A.8., the parties shall contact the appropriate magistrate judge and meet with the court in an effort to resolve any dispute with respect to the defendants' compliance with this agreement. No motion or other proceeding seeking enforcement of this agreement shall be filed or otherwise initiated until the parties have exhausted their discussions with the magistrate judge.

10. The plaintiffs may bring an action to enforce this agreement solely upon a pattern of noncompliance. Individual, isolated instances of noncompliance shall not be sufficient grounds for an enforcement action.

11. If, after exhausting the mandatory, informal resolution process outlined above in paragraphs A.8. and A.9., the plaintiffs file a motion seeking an order to enforce any portion of this agreement, the plaintiffs' request for relief must be limited to specific performance. No money damages may be sought. The plaintiffs shall not seek an order of contempt unless and until (1) the plaintiffs have sought to enforce this agreement by filing an appropriate motion with the court and (2) the court has issued a clear and unambiguous order of specific performance to the defendants. Before an order of contempt is issued, the court shall find by clear and convincing evidence that the defendants did not diligently attempt in a reasonable manner to substantially comply with the court's clear and unambiguous order.

12. Plaintiffs' entitlement to attorneys' fees for monitoring and enforcement of this agreement shall be limited to the three year effective term of this agreement, and shall be limited to the hourly rates permitted under the Prison Litigation Reform Act. In no event shall plaintiffs' entitlement to attorneys' fees for monitoring and enforcement exceed $20,000 in any calendar year for attorney's fees and $5,000 a year for plaintiff's monitoring and enforcement expenses.

13. After the Court adopts this settlement agreement, the Court's jurisdiction over the matters set forth in this litigation shall be limited, and specifically, the Court shall retain jurisdiction solely to ensure that the defendants have fulfilled the obligations undertaken in this settlement agreement. If the plaintiffs have reasonable cause to believe that the defendants have failed to substantially perform any obligation undertaken in this settlement agreement, they may follow the procedures for seeking enforcement as set forth in paragraphs A.8. – A.11. herein. At any hearing regarding the issue of the defendants' compliance with the terms of this agreement, plaintiffs shall have the burden of proving that the defendants have a pattern of failing to substantially comply with one or more of the terms of this agreement. If, after hearing, the Court finds that the defendants have failed to substantially comply, the sole remedy shall be an order

directing specific performance of the agreement herein. The Court shall apply Connecticut state contract law in deciding any motion seeking specific performance. For purposes of this agreement, "substantially comply" and "substantial compliance" mean that the defendants are in compliance with the terms of this agreement in all material respects.

14. Only the plaintiffs named in this agreement or James McGaughey's successors in office shall have standing to file a motion seeking enforcement of any of the terms and conditions of this agreement. This agreement does not confer, and is not intended to confer, any rights upon any other party. The parties to this agreement expressly acknowledge that there shall be no third party beneficiaries to this agreement. Further, any consultants appointed by the parties to audit compliance with this agreement shall have no authority to initiate any proceedings with the court. Only the parties are authorized to initiate proceedings with the court.

15. This agreement in no way waives or otherwise affects, limits or modifies the obligations of inmates to comply with the exhaustion requirements of the Prison Litigation Reform Act, the administrative directives of the Department of Correction or any current or future state or federal law governing the rights and obligations of incarcerated persons.

16. Nothing in this agreement shall require or permit the defendants to violate the laws of the State of Connecticut or the United States of America, nor violate any terms or conditions of any collective bargaining agreements to which the State of Connecticut is or becomes a party. "Laws of the State of Connecticut or the United States of America" are state and federal constitutional provisions, statutes, judicial decisions, Rules of Court and regulations of administrative agencies.

17. The defendants agree that at the present time they are not aware of any conflict between this Agreement and the Laws of the State of Connecticut or any presently existing collective bargaining agreements to which the State is a party. The Commissioner and other policy-making officials of the Department of Correction further agree that they will not seek any new Laws or the execution of new collective bargaining agreements, or any changes or amendments to existing Laws or collective bargaining agreements, that would undermine the obligations undertaken in this Agreement. Nothing in this section shall affect the Department of Correction's ability to defend litigation brought against it, to pursue all litigation options and to exhaust all appeal rights. If, in the future, there arises a conflict between the defendants' obligations under this Agreement and any Laws of the State of Connecticut or collective bargaining agreement, the defendants may follow the laws of the State of Connecticut or collective bargaining agreement, and they shall promptly notify counsel for the plaintiffs of the perceived conflict. In the event that the defendants, due to such a claimed conflict, cease compliance with any provision of this Agreement, the plaintiffs may seek to enforce this Agreement or may seek reformation of the Agreement to address such cessation of compliance. Compliance with any law or collective bargaining provision that is determined by the court to conflict with defendants' obligations under this Agreement

shall be a complete defense to a claim of noncompliance with this Agreement. Prior to instituting any such enforcement or reformation action, the plaintiffs shall notify the defendants, and the parties shall meet with the Court. The provisions of A.8. – A.11. do not apply in these circumstances. The defendants shall continue in full compliance with all provisions of this Agreement that are not affected by the purportedly conflicting Law or collective bargaining agreement.

18. Nothing in this agreement shall be construed to limit, in any way, the authority of the Commissioner of the CDOC to transfer inmates to other state or federal jurisdictions and/or to a private prison.

## B. SPECIFIC PROVISIONS

### 1. Definitions

"CDOC" means the Connecticut Department of Correction, UConn Correctional Managed Health Care, and their employees, contractors, and agents.

"Congregate programming" means programming in which the prisoner interacts with other prisoners.

"Consultants" means the consultants provided for in paragraph B.17.

"DMHAS" means the Connecticut Department of Mental Health and Addiction Services.

"Designated housing unit for the mentally ill" means the IPM, IMHU, F Block, G Block, and H Block at Garner Correctional Institution, the observation cells at NCI, as well as any housing unit that may hereafter be established at GCI or NCI where prisoners are housed due to mental illness or impairment.

"Doctoral-level clinician" means a licensed psychiatrist, or a licensed psychologist with a Ph.D., Psy.D., or Ed.D. degree.

"Exigent circumstances" means circumstances under which the doing of an act otherwise required by this Agreement would create an unacceptable risk to the safety of any person. Whenever an act otherwise required by this Agreement is excused on account of "exigent circumstances," defendants shall attempt to resolve the "exigent circumstances" as soon as possible, and the act shall be performed as soon as possible after the "exigent circumstances" cease to exist.

"GCI" means Garner Correctional Institution.

"IMHU" means the Intensive Mental Health Unit at Garner Correctional Institution.

"IPM" means the Inpatient Mental Health unit at Garner Correctional Institution.

"NCI" means Northern Correctional Institution.

"Observation" means that an inmate has been removed from a housing unit at NCI and admitted to an observation cell in the NCI medical unit because of mental health concerns.

"Prisoner housed in a designated housing unit for the mentally ill" does not include a prisoner whom a doctoral-level clinician has certified in writing is housed in such a unit for reasons unrelated to that prisoner's mental health.

"Programming" means therapeutic, educational, recreational, work, or other activities.

"Qualified Mental Health Professional" and "Practitioner" mean psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients. (Taken from NCCHC Standard J-E-05 Re: Mental Health Screening and Evaluation).

"Serious assault" means intentionally striking, attacking or attempting to strike or attack a Department of Correction employee, another inmate or any other person, with or without the use of an object or substance (Taken from DOC Code of Penal Discipline, A.D. 9.5.12 C & D).

"Seriously mentally ill" has the meaning set forth in Appendix A hereto.

## 2. Scope of Agreement

Except as specified in paragraph B.4. below, this Agreement applies only to prisoners housed at GCI and NCI.

## 3. Removal of the Seriously Mentally Ill from NCI

Persons who are subject to the DMHAS evaluation process set forth in Appendix B hereto and meet the definition of "Seriously Mentally Ill", as defined in Appendix A hereto, shall be removed from NCI within ten business days of receipt of DMHAS' report, absent exigent circumstances. If the removal of a prisoner is delayed because of "exigent circumstances," defendants shall attempt to resolve the "exigent circumstances" as soon as possible, and the prisoner shall be removed as soon as possible after the "exigent circumstances" cease to exist.

## 4. Exclusion of the Seriously Mentally Ill from NCI's Administrative Segregation Program

Any prisoner being considered for transfer to NCI for placement in the administrative segregation program shall be evaluated by a licensed doctoral-level clinician, or by a qualified mental health professional if a licensed doctoral-level clinician is not available,

6

to determine whether the prisoner is seriously mentally ill. Absent exigent circumstances or the unavailability of a qualified mental health professional, the evaluation will take place prior to the transfer of the inmate to NCI's administrative segregation program. In the event there was no pre-transfer evaluation, or if the prisoner was not evaluated by a licensed doctoral-level clinician prior to transfer, then an evaluation by a licensed doctoral-level clinician shall be completed by the end of the third business day after the inmate's transfer to NCI's administrative segregation program. The evaluation shall include, at a minimum, review of the prisoner's medical and mental health files, and custody data, and a face-to-face interview with the prisoner, conducted in a private, confidential setting. For any prisoner being considered for transfer to NCI's administrative segregation program or transferred to NCI's administrative segregation program under this paragraph, defendants shall make a good faith effort to obtain records from any pre-incarceration psychiatric hospitalization, and any such records, if obtained, shall be reviewed by the doctoral-level clinician as part of the evaluation. If the prisoner is found to be seriously mentally ill, he shall not be transferred to or kept at NCI's administrative segregation program, except as set forth below:

1. Absent exigent circumstances, no seriously mentally ill prisoner shall be transferred to the administrative segregation program at NCI without prior notice to plaintiffs. If defendants wish to transfer a seriously mentally ill prisoner to the administrative segregation program at NCI, they shall give plaintiffs at least ten days' advance notice of the proposed transfer, unless exigent circumstances make such notice impracticable.

2. No seriously mentally ill prisoner shall be housed in the administrative segregation program at NCI unless defendants have produced a report to plaintiffs that

   a. provides documentation of the prisoner's dangerousness;
   b. describes all potential alternative placements, both in Connecticut and outside the state, that defendants have considered for the prisoner, and explains why none of them is workable; and
   c. identifies the additional services that will be provided to the prisoner if he is transferred to NCI, to help him with his serious mental illness and to mitigate the effect the conditions at NCI have on that illness.

If a prisoner housed at NCI in the administrative segregation program is found to be seriously mentally ill, that prisoner shall be removed from NCI within 10 days of that finding unless exigent circumstances warrant otherwise. If the removal of a prisoner is delayed because of "exigent circumstances," defendants shall attempt to resolve the "exigent circumstances" as soon as possible, and the prisoner shall be removed as soon as possible after the "exigent circumstances" cease to exist.

A prisoner who has been deemed unsuitable for transfer to NCI and placement in the administrative segregation program because he is seriously mentally ill, or has been removed from NCI's administrative segregation program because he is seriously mentally

7

ill, shall not thereafter be transferred to NCI and placed in the administrative segregation program unless (a) the dangerousness exception set forth in point 2. above applies or (b) unless more than four months have passed since the prisoner was found to be seriously mentally ill; a UCONN doctoral-level clinician has determined, after appropriate evaluation, that the prisoner is not currently seriously mentally ill and is not likely to become seriously mentally ill if transferred to NCI; and these findings are confirmed by an independent evaluation performed by a doctoral-level clinician from DMHAS selected by the parties. In the event the UCONN doctoral level clinician and the DMHAS doctoral level clinician disagree, the Commissioner of the DOC ("Commissioner') may transfer the prisoner to NCI and place him in the administrative segregation program if the Commissioner explains in writing why he/she disagrees with the conclusion of the independent DMHAS evaluation and agrees with the finding by the UCONN clinician that the inmate is not seriously mentally ill and is not likely to become seriously mentally ill if transferred to NCI and placed in the administrative segregation program. Conversely, if the Commissioner agrees with the evaluation done by the DMHAS clinician, the prisoner shall not be transferred to NCI and placed in the administrative segregation program. A copy of the written explanation will be sent to plaintiffs and to the consultants. A prisoner who is subject to this review process may be transferred to NCI and placed in the administrative segregation program pending the outcome of the review process; provided that in such cases, the initial determination shall take place within five days of that transfer, the independent evaluation shall take place within 10 days of the initial determination, and the Commissioner's review shall take place within five days of the independent evaluation. If the result of the review process is to transfer the prisoner back out of NCI's administrative segregation program, that transfer shall take place within five days of the completion of the review process. Defendants shall promptly notify plaintiffs and the consultants whenever a prisoner who has previously been found to be seriously mentally ill is transferred to NCI and placed in the administrative segregation program.

### 4.a.   Periodic Evaluations

Prisoners housed at NCI and in the administrative segregation program shall be evaluated not less than every 90 days by a doctoral-level clinician to determine whether their mental health is being adversely affected by confinement at NCI's administrative segregation program. This evaluation shall include, at a minimum, review of the prisoner's medical, mental health, and custody files, and a face-to-face interview with the prisoner, conducted in a private, confidential setting.

### 5.   Mental Health Staffing

CDOC shall employ at least 1 FTE psychiatrist, or the equivalent of 1 FTE psychiatrist, for each 150 prisoners who are prescribed psychotropic medications at GCI and NCI. Prisoners prescribed psychotropic medication by a M.D. for a reason other than for treating a mental health condition, shall not be included in this "150 prisoners" figure for staffing purposes provided however, that such prescriptions shall be subject to audit by the consultants as described below. For purposes of this section and section B.5.A.,

psychotropic medication to treat dyssomnia, or sleep disorders shall be considered to be prescribed for treating a mental health condition. By "equivalent" in the first sentence is meant that some of the hours of psychiatric time can be replaced by hours of an APRN's time; but at least 60% of the required psychiatrist time must be filled by a psychiatrist; and when APRN hours are substituted for psychiatrist hours, there must be 1.2 hours of an APRN's time for every substituted hour of a psychiatrist's time. Thus, for example, if the equivalent of 1 FTE psychiatrist is required in an institution where 150 prisoners are prescribed psychotropic medications, this requirement can be met by having a psychiatrist 60% of full time and having an APRN 1.2 X 40% time, in other words, (if full-time is considered to be 40 hours per week), 24 hours of a psychiatrist's time and 1.2 X 16 or 19.2 hours of an APRN's time. In terms of other staffing levels, the CDOC will comply with the National Commission on Correctional Health Care 2003 Standard #M-C-07, to wit:

"A written staffing plan assures that a sufficient number of health staff of varying types is available to provide adequate and timely evaluation and treatment consistent with contemporary standards of care."

"Compliance Indicators: (1) All aspects of the standard are addressed by written policy and defined procedures. (2) The responsible health authority approves the staffing plan. (3) The adequacy and effectiveness of the staffing plan are assessed by the facility's ability to meet the health needs of the inmate population."

In accordance with the NCCHC 2003 standard #P-A-06, "A continuous quality improvement (CQI) program in all facilities monitors and improves upon health care delivered in the facility," a quality assurance/peer review mechanism will be developed to monitor the adequacy and effectiveness of the staffing plan, and changes to that plan will be made accordingly.

The usual and customary practice will be to provide the staffing required to implement this agreement. However, short-term deviations shall be permitted in instances of absence beyond the power of the defendants to correct by means of providing overtime assignment or by any other means reasonably available to defendants. Defendants shall give written notice of any such deviations to plaintiffs and to the consultants.

### 5a.   Psychoactive Medication

University of Connecticut Health Center, Correctional Managed Health Care, Policy and Procedures Number G 51.05 (Revised 12/20/01, 6/18/03) will be followed, with these additions and changes:

No prisoner shall have a prescription for psychotropic medication initiated, changed or discontinued without a prior, private, face-to-face interview with a psychiatrist, or APRN under a psychiatrist's supervision, unless exigent circumstances exist or an inmate refuses to participate in a private face-to-face interview. In cases where a prisoner is admitted to NCI or GCI already receiving prescribed psychotropic medications, the medications can

9