be prescribed prior to a visit with a psychiatrist or APRN, but with an order by a psychiatrist or APRN, pending a face-to-face visit within three days. Any prisoner who is prescribed psychotropic medication shall be evaluated in a private face-to-face interview with a psychiatrist or APRN at least every two months, or more often if clinically indicated. If the prisoner refuses to exit his cell to meet with the psychiatrist or APRN in an office for the purpose of an initial assessment for medications or a follow-up evaluation, the clinician will go to see the prisoner at his cell, assess the clinical situation, devise and institute an appropriate intervention for the individual prisoner under the circumstances, and record the encounter and the intervention in the medical chart within 96 hours of the refusal. In the case of routine changes or prisoner-initiated discontinuation of prescribed medications, the prescribing psychiatrist or APRN will attempt to schedule a meeting with the prisoner within 7 days of the refusal, to discuss the prisoner's condition and medications, or, if he refuses to come to the office, will visit the prisoner at his cell within 96 hours of the refusal, and will devise and carry out an appropriate treatment plan and record it in the prisoner's chart.

The foregoing paragraph does not apply to psychotropic medications prescribed by an M.D. for a reason other than for treating a mental health condition. The consultants shall address such prescriptions in the audit instrument described in Section B.17. and shall review the issuance of such prescriptions as part of their audits.

According to Policy #G 51.05, "The CMHC psychiatrist, or CMHC APRN with psychiatric certification, shall sign telephone orders within 72 hours of the order." At NCI and GCI, if a telephone order is given, the psychiatrist or APRN will try to see the prisoner within 24 hours if practical, but in any event shall see the prisoner within 72 hours. The meeting will occur in a private, confidential setting unless exigent circumstances or the prisoner's refusal make this impracticable.

6. **Confidentiality of Mental Health Services**

Prisoners shall have the opportunity to request mental health services 7 days a week through a confidential written request system. These requests shall be collected 7 days a week, and shall be triaged by mental health staff within 24 hours of collection. These requests, and any responses to them, shall be filed in the prisoner's mental health file. Except in emergencies or in instances where an inmate refuses to come out of his cell for a private interview, mental health evaluation and/or treatment shall not be provided at cell-front, but shall be delivered in a setting that provides audio privacy from other prisoners and from non-health care staff. If the prisoner refuses to exit his cell, a licensed doctoral level clinician or APRN will go to see the prisoner at his cell within 96 hours of the refusal, assess the clinical situation, devise and institute an appropriate intervention for the individual prisoner under the circumstances, and record the encounter and the intervention in the prisoner's health record.

Whenever CDOC policy or this agreement require that a prisoner be "evaluated," seen," "examined," "interviewed," "assessed," or "screened" (or any other similar term) for mental health purposes (including the 30 and 90 day mental health reviews required by A.D. 9.4, "Restrictive Status," para. 14.D.), a "cell front" interview shall not satisfy this

requirement. Rather, the prisoner shall be interviewed in a setting that provides audio privacy from other prisoners and from non-health care staff. This provision shall not apply in instances where an inmate refuses to come out of his cell for a private interview. If the prisoner refuses to exit his cell, a licensed doctoral level clinician or APRN will go to see the prisoner at his cell within 96 hours of the refusal, assess the clinical situation, devise and institute an appropriate intervention for the individual prisoner under the circumstances, and record the encounter and the intervention in the prisoner's health record.

7. **Use of Force on the Mentally Ill**

Prior to a planned use of force on a prisoner housed in a designated housing unit for the mentally ill, clinical intervention shall be attempted by a qualified mental health provider, acting in consultation, if possible, with a doctoral-level clinician. The provider shall attempt to verbally counsel the prisoner and attempt to persuade him to cease the behavior that has led to the planned use of force. The provider shall document this process in the prisoner's health record.

If the clinical intervention described in the previous paragraph does not, in the opinion of the shift supervisor, resolve the situation requiring use of force, the shift supervisor shall issue a verbal warning to the prisoner, and shall provide the prisoner with a reasonable amount of time to cease the offending behavior before initiating the use of force. The shift supervisor shall document this warning in an incident report.

Prior to a planned use of chemical agents on a prisoner housed in a designated housing unit for the mentally ill, and absent exigent circumstances, the prisoner's health record shall be consulted by a qualified member of health services staff to determine whether the use of chemical agents on the prisoner is medically contraindicated. The substance of this consultation shall be documented on a medical incident report or the prisoner's health record.

Nothing in this section shall preclude a shift supervisor from authorizing use of force in an emergency to prevent significant injury to the inmate in question, or another person, or damage to property that raises safety concerns.

8. **Discipline**

Before a Class A disciplinary report as defined in A.D. 9.5 is delivered to a prisoner housed in a designated housing unit for the mentally ill, a qualified mental health professional shall be consulted and asked to express an opinion as to (1) Whether the behavior for which the disciplinary report is given is a result of the prisoner's mental illness, and (2) Whether disciplining the prisoner would aggravate his mental illness. This consultation shall be documented in an incident report, a disciplinary investigator's report or the inmate's health record. If the practitioner answers in the affirmative to either of Questions (1) or (2) above, the disciplinary report shall not be delivered to the prisoner and shall be dismissed, unless the Warden directs in writing otherwise. In any

11

case in which a prisoner is given a disciplinary report despite the practitioner's affirmative answer to Questions (1) and/or (2), the form on which the practitioner's opinion is noted shall be given to the hearing officer prior to the disciplinary hearing and/or the imposition of any sanction.

In no event shall a prisoner receive disciplinary sanctions for verbally reporting to appropriate CDOC staff feelings or intentions regarding self-harm or suicide.

9. **Observation**

Any prisoner at NCI who remains on Observation for more than 72 hours shall be transferred on an emergency basis to GCI. Prisoners in Observation shall be treated in compliance with NCCHC standards governing use of restraints and seclusion.

10. **Restraint Policy**

No prisoner shall be required to wear restraints during recreation, except that:

1. Upon transfer to Phase I of the administrative segregation program at NCI, a prisoner who has committed a serious assault or other serious incident that significantly impacts the operation of a housing unit or facility within the past 90 days may be required to wear restraints during recreation for not more than a 7 day period, unless a facility classification review demonstrates in writing a legitimate reason for continuing restraints.

2. A prisoner who, while housed at NCI, commits a major misconduct involving serious assault or other serious incident that significantly impacts the operation of a housing unit or facility may be required to wear restraints during recreation for not more than a 21 day period, unless a facility classification review demonstrates in writing a legitimate reason for continuing restraints.

3. Use of restraints during recreation for prisoners housed in a designated housing unit for the mentally ill shall be governed by paragraph B. 16 and not by this section.

4. A monthly report shall be generated and given to plaintiffs and the consultants listing every prisoner who has been required to wear restraints during recreation for 21 or more days and for each such prisoner, the dates he has been required to wear restraints during recreation.

No prisoner shall be required to wear hand or wrist restraints during non-contact visiting, except that:

1. Upon transfer to Phase I of the administrative segregation program at NCI, a prisoner who has committed a major misconduct involving serious assault or other serious incident that significantly impacts the operation of a housing unit or

12

facility within the past 90 days may be required to wear hand or wrist restraints during non-contact visiting for not more than a 7 day period, unless a facility classification review demonstrates in writing a legitimate reason for continuing restraints.

2. A prisoner who, while housed at NCI, commits a major misconduct involving serious assault or other serious incident that significantly impacts the operation of a housing unit or facility may be required to wear hand or wrist restraints during non-contact visiting for not more than a 21 day period, unless a facility classification review demonstrates in writing a legitimate reason for continuing restraints.

3. A monthly report shall be generated and given to plaintiffs and the consultants listing each prisoner who has been required to wear hand or wrist restraints during visiting for 21 or more days and for each such prisoner, the dates he has been required to wear restraints during visiting.

A prisoner for whom a major misconduct has been dismissed, or of which the prisoner has been found not guilty, shall not be deemed to have "committed" that misconduct for purposes of this section.

For prisoners housed in a designated housing unit for the mentally ill, four point restraints shall be applied and maintained only in accordance with A.D. 6.5, Use of Force (revised 2/28/03) section 9 on use of therapeutic restraints, a copy of which is attached as Appendix C.

## 11. Programming in Phase 1

Programming will be available to all prisoners in all three phases of the NCI administrative segregation program. Prisoners may have the opportunity to complete assignments while in their cells, but not all programming will be conducted exclusively in-cell. Programming will be available in English and Spanish. Sign language interpreter services shall be made available to deaf or hard of hearing prisoners, and any written material shall be made available in either Braille or large print format to any prisoner who is blind or has a visual impairment. Prisoners who are unable to read or write or otherwise unable to complete written assignments because of learning disabilities or other disabilities that preclude them from being able to concentrate (such as ADD or ADHD) shall be excused from all written assignments.

The prisoner's demonstrated willingness to participate in the programming will be a factor that may be considered by the classification committee in deciding whether the prisoner will progress to the next phase of the NCI administrative segregation program; but specific answers given or not given in the course of that participation shall not be a factor that may be considered by the classification committee unless they demonstrate an unwillingness to participate or are threatening.

13

12. **Length of Phase 1**

The minimum duration of NCI's administrative segregation Phase 1 shall be 120 days. After 180 days on Phase 1, a prisoner shall be promoted to Phase 2 unless a facility classification review demonstrates in writing a legitimate reason for the inmate to remain in Phase I.

If a prisoner remains on Phase 1 for more than 120 days, he shall be evaluated by a doctoral-level clinician to determine whether his progress through the phase system is being impaired by mental illness. This evaluation shall include, at a minimum, review of the prisoner's medical, mental health, and custody data, and a face-to-face interview with the prisoner, conducted in a private, confidential setting. The practitioner shall document this evaluation, and the practitioner's findings, in the inmate's health record. If the practitioner finds that the prisoner's progress through the phase system is being impaired by mental illness, the practitioner shall report this finding to the classification committee, which shall consider promotion of the prisoner to Phase 2, or other accommodation for the prisoner's mental illness. If the prisoner is not promoted to Phase 2, the evaluations required by this paragraph shall thereafter occur every 30 days while the prisoner remains in Phase 1.

A monthly report shall be generated and given to plaintiffs and the consultants listing every prisoner who has remained in Phase I for more than 120 days and for each such prisoner, the length of his stay at Phase I and the reason(s) for his continued stay in Phase I.

13. **Conditions of Confinement**

Defendants shall install, and maintain in good working order, calendar clocks that are in or visible from all cells at GCI and NCI's administrative segregation program.

Prisoners in Phases 1, 2, and 3 of the NCI administrative segregation program shall be allowed to purchase commissary-approved audio devices at their own expense.

Prisoners in Phase 1 of NCI's administrative segregation program shall be allowed at least five hours out-of-cell outdoor recreation time per week.

After thirty days, prisoners in Phase 2 of NCI's administrative segregation program shall be allowed at least seven and one-half hours out-of-cell time per week, of which at least five hours shall be outdoor recreation time, and at least two and one-half hours shall be congregate programming.

Prisoners in Phase 3 of NCI's administrative segregation program shall be allowed at least fourteen hours out-of-cell time per week, of which at least five hours shall be outdoor recreation time, and at least two and one-half hours shall be congregate programming.

### 14. Family

Visiting, commissary or telephone calls may be reduced or eliminated as a penalty for misconduct by a prisoner. However, an inmate found guilty of a disciplinary report shall not lose both visiting and telephone privileges at the same time. Although there is no limit on the amount of time for which an inmate can lose visiting or telephone privileges if he continues amassing disciplinary reports, the maximum amount of time that may be served at any one time is 45 consecutive days. By way of example, if an inmate amasses several disciplinary reports and loses 135 days of visiting privileges and 135 of telephone privileges, the sanctions shall be served as follows: 45 days loss of phone privileges, with no loss of visiting privileges during this 45 day period. Then the phone privileges are temporarily restored for 45 days, while the inmate is on loss of visiting for 45 days, then visiting privileges are restored temporarily for 45 days, while the inmate is on loss of phone privileges for 45 days. The sanctions shall be served in this staggered manner until an inmate has served day for day each penalty imposed. In no event shall mail, legal visiting or legal telephone calls be reduced, eliminated, or otherwise affected as a sanction for misconduct, except that mail may be restricted for mail related misconduct.

### 15. Staff Training

All security staff at NCI and GCI shall receive at least eight hours of training per year on mental health issues. This training shall cover, at a minimum, the following topics:

- prevention of suicide and self-harm
- recognizing signs of mental illness
- communication skills for interacting with prisoners with mental illness
- alternatives to discipline and use of force when dealing with prisoners with mental illness.

This training shall include both live instruction and distribution of written materials, and shall be provided by instructors at an ACA accredited training academy.

### 16. Garner Correctional Institution

In the IPM and IMHU units and other designated housing units for the mentally ill at GCI, there will be 3 hours a day, 5 days a week of out-of-cell therapeutic, educational, rehabilitative and recreational programs offered to all prisoners who are capable of safely participating. These programs will include but are not limited to individual and group psychotherapy, milieu therapy, case management, social work intervention, a variety of psychiatric rehabilitation programs, substance abuse programs, recreational activities and supervised free time out of cell. Prisoners who are capable of safely doing so will participate in out-of-cell therapeutic, educational, rehabilitative and recreational activities at least 3 hours per day, 5 days a week. The aim is to progress every prisoner to participate in at least 5 hours per day of out-of-cell programming as soon as possible or when clinically indicated. If, because of a prisoner's assaultiveness, recent disciplinary reports, mental status, or other exigent circumstances, this much out-of-cell activity is

15

deemed inappropriate by mental health and correctional staff, or if limits on the manner of out-of-cell activity, including the use of restraints during recreation, is deemed necessary by correctional staff, then an individualized treatment plan will be devised and put into effect with one of its aims being the rapid preparation of the prisoner for participation in the therapeutic milieu and the therapeutic programs that are available on the unit for at least 5 hours per day, 5 days a week, and the end of any limits on the manner of out-of-cell activities, including the use of restraints during recreation.

Each inmate in the GCI treatment program will have an individualized treatment plan developed by the inmate's treatment team. The inmate's programming will be provided in accordance with the individualized treatment plan.

Defendants shall provide a monthly report prepared by the supervising psychologist to the plaintiffs, to the consultants, to the Facility Warden, Health Services Administrator, and to the CMHC Director of Mental Health Services, listing all prisoners whose out-of-cell activities have been restricted to less than 5 hours per day or whose manner of out-of-cell activities has been limited, including wearing of restraints during recreation, for more than seven consecutive days under the provisions of the previous paragraph and describing the rationale for the restrictions.

Upon admission to GCI, an inmate housed in a designated housing unit for the mentally ill may spend up to his first seven days in a "diagnostic and evaluation" program that may limit his out-of-cell time to the extent found appropriate by mental health and custody staff.

Where disciplinary problems arise, they will be managed according to this agreement, and in every instance possible, by having mental health staff collaborate with correctional staff in devising an intervention strategy that both maintains security and the smooth operation of the institution and promotes the aims of prisoners' mental health treatment.

### 17. Enforcement and Compliance Assessment

This agreement shall remain in effect only for a period of three years from the effective date. The agreement, and all rights and obligations arising thereunder, shall terminate and shall no longer be enforceable three years from the effective date. Upon termination, without the need for any further order of any state or federal court, all jurisdiction of any court, as well as the right of the plaintiffs to seek specific performance of this agreement, shall end, and no court shall have the power or jurisdiction to enforce this agreement. The parties agree that nothing in this agreement may be construed to authorize the court to extend this agreement beyond the termination date referred to in this paragraph, and the plaintiffs expressly agree that they will not seek, and are barred from seeking, an extension of this agreement. As of the third anniversary of the effective date of the agreement, all rights and obligations shall terminate and any pending action for relief would be moot. In the event any motions or proceedings are pending on the third anniversary of the effective date of this agreement, the court shall be bound to dismiss any such motions or proceedings as the court's jurisdiction shall terminate with the exception of any attorneys' fees motions not yet acted upon by the Court.

The parties agree not to unilaterally seek to modify, extend, add to, terminate, or otherwise challenge this agreement, under the Prison Legal Reform Act or otherwise, for the duration of the three-year enforcement period. The parties further agree that this agreement may be modified or terminated at any time by mutual, written agreement.

To assess the defendants' compliance with this agreement, the plaintiffs shall appoint a mental health consultant and a custody consultant and the defendants shall appoint a mental health consultant and a custody consultant, for a total of two consultants each, and a grand total of four consultants. The consultants shall be given continued access to GCI and NCI to monitor compliance with this agreement. As part of their assessment function the consultants shall have full access to the two facilities and all documents not covered by the attorney-client or work product privileges in the defendants' possession or control that pertain to NCI or GCI, except documents maintained by CDOC that relate to facility security operations, including but not limited to blueprints, chapter seven of the administrative directives, chapter seven of the unit directives, post orders, emergency plans, internal photographs, staff home phone numbers or home addresses, personnel files, or similar documents. The consultants shall also be permitted to conduct private, confidential interviews, on a voluntary basis, as to matters listed on the audit instrument, with both (1) GCI and NCI inmates and (2) any CDOC staff whose responsibilities pertain to NCI or GCI. CDOC will encourage CDOC staff members to talk to the consultants. However, it is understood by all parties that if a particular inmate has pending litigation against the CDOC or its employees, the CDOC staff members may be advised to contact their attorney first, before discussing said inmate with the consultants.

The parties will submit to the court the issue of ordering the disclosure of prisoner health records to the consultants. The parties and their consultants stipulate that any health records ordered to be disclosed by the Court shall be used solely to evaluate compliance with this agreement and all copies of health records shall be destroyed upon termination of this agreement.

The Court shall not, sua sponte or otherwise, expand or alter the provisions of this agreement. The court may, however, act on a motion to reform this agreement as set forth in Paragraph A.17.

The consultants shall not disclose to any inmate information which they obtained under this agreement without prior notification to the parties and their attorneys. Defendants shall have the right to object to the consultants' disclosure of information which, if disclosed to an inmate, could jeopardize the safety and security of staff, other inmates or the general public.

Each mental health consultant shall be a qualified mental health professional, and each party shall submit the name and credentials to the opposing party prior to the date this agreement becomes effective.

The consultants' sole function shall be to review compliance with this agreement. The consultants shall not review or become involved in matters which are not directly provided for in this agreement and they shall perform this function in accordance with their respective audit instruments. The consultants have no authority to add to or to alter the provisions of this agreement.

Prior to the effective date of this agreement, the mental health consultants shall meet with appropriate CDOC personnel and develop an audit instrument for the purpose of evaluating compliance with the mental health sections of this Agreement and the custody consultants shall meet with appropriate CDOC personnel and develop an audit instrument for the purpose of evaluating compliance with the custody sections of this Agreement. The audit instruments shall be developed solely to assess whether CDOC is in compliance with the express terms and conditions of this agreement, and may not be modified by the consultants during the three years this agreement is in effect except if, by mutual agreement of the two consultants who developed the audit instrument, they find it reasonably necessary in order to perform their duties. Once approved by the parties, the audit instruments shall form the basis of all consultant evaluations, and at no time may either consultant assess any aspect of CDOC operations that is not specifically identified in the audit instruments.

The audits shall be completed according to the following schedule, with reports submitted to counsel for the plaintiffs and the defendants:

- Six months after the effective date of the agreement
- One year after the effective date of the agreement
- Eighteen months after the effective date of the agreement
- Twenty-four months after the effective date of the agreement
- Thirty months after the effective date of the agreement

All consultants' reports shall remain confidential, and shall not be disclosed publicly by the consultants during the effective term of this agreement, except for the purpose of pursuing or defending any action to enforce this agreement, and except if disclosure is ordered by a court of competent jurisdiction. If either party to this agreement is made aware of a request for the entry of such a court order, that party shall notify the other parties to the agreement.

The consultants shall work collaboratively and in an effort to reach consensus on their audit items. In the event the consultants are unable to agree on the audit instrument or on whether the defendants are in compliance with one or more terms of this agreement, then the consultants shall select, by mutual agreement, a neutral expert to arbitrate these issues. The neutral expert shall be entitled to the same level of access to facilities, records, staff and inmates as the consultants.

It is expressly understood and agreed that any consultants appointed by the parties, and anyone selected to arbitrate disputes among the parties' consultants, are not court monitors or special masters, and that the consultants will not submit their reports or have

any communications with the Court without the express agreement of all parties. No consultant shall engage in any ex parte communications with any court having jurisdiction to enforce the terms of this agreement.

Upon submission of an appropriate invoice for services and expenses, CDOC shall reimburse each of the plaintiffs' consultants in an amount not to exceed a grand total of $40,000 per year for each of the three years this agreement is in effect (a year shall be each 12 month period following the effective date of this agreement). In the event that a neutral expert is required to arbitrate disputes between the consultants as set forth in this paragraph and as set forth in paragraph A.8., CDOC shall reimburse each such neutral expert in an amount not to exceed $15,000.00 per year.

## 18.  Attorneys' Fees and Costs

The defendants shall pay to the plaintiffs the sum of $177,850.00 for attorneys' fees and $13,131.16 for costs incurred in this case to date. Any future awards of attorneys' fees shall be calculated in accordance with the hourly rates established pursuant to the Prison Litigation Reform Act and limited to $20,000 a year as set forth in Paragraph A12 above for attorney's fees and $5,000 a year for plaintiff's monitoring and enforcement expenses.

## 19.  Approval of Legislature Required

Prior to submission of this agreement to the Court for approval, the parties acknowledge that the defendants' authority to enter into this Settlement Agreement is contingent upon the General Assembly's approval of this agreement pursuant to Conn. Gen. Stat. § 3-125a. The defendants have not obtained the General Assembly's approval at the time they and their attorneys signed this agreement, and will not have the General Assembly's approval until such time as the General Assembly has approved this agreement by resolution, or the thirty day period for the General Assembly to consider this agreement has elapsed, as described in Conn. Gen. Stat. § 3-125a.