| | |
|---|---|
| PLAINTIFFS,<br>Office of Protection & Advocacy | DEFENDANTS,<br>Wayne Choinski, et al. |

_____
James M. McGaughey
Executive Director

_____
Theresa C. Lantz
Commissioner of Correction

RICHARD BLUMENTHAL
ATTORNEY GENERAL

_____
Nancy Alisberg
Office of Protection & Advocacy
Federal Bar No. ct21321
60-B Weston Street
Hartford, CT  06120
Tel. (860) 297-4300 Fax (860) 566-8714
E-Mail: nancy.alisberg@po.state.ct.us

BY: _____
Terrence M. O'Neill
Assistant Attorney General
Federal Bar No. ct10835
110 Sherman Street
Hartford, CT  06105
Tel. (860) 808-5450 Fax (860) 808-5591
E-Mail: terrence.oneill@po.state.ct.us

_____
Ben A. Solnit
Tyler, Cooper & Alcorn, LLP
Federal Bar No. ct00292
205 Church Street
New Haven, CT  06509-1910
Tel. (203) 784-8200 Fax. (203) 777-1181
E-Mail: solnit@tylercooper.com

_____
Ann E. Lynch
Assistant Attorney General
Federal Bar No. ct08326
110 Sherman Street
Hartford, CT  06105
Tel. (860) 808-5450 Fax (860) 808-5591
E-Mail: ann.lynch@po.state.ct.us

_____
David C. Fathi
Federal Bar No. ct22477
ACLU National Prison Project
733 15th Street, NW, Suite 620
Washington, DC  20005
Tel. (202) 393-4930 Fax. (202) 393-4931
E-Mail: dfathi@npp-aclu.org

_____
Steven R. Strom
Assistant Attorney General
Federal Bar No. 01211
110 Sherman Street
Hartford, CT  06105
Tel. (860) 808-5450 Fax (860) 808-5591
E-Mail: steven.strom@po.state.ct.us

_____
Erin Boggs
Federal Bar No. ct22989
Interim Legal Director
Connecticut Civil Liberties Union Foundation
32 Grand Street
Hartford, CT  06106
Tel. (860) 247-9823 x211 Fax (860) 728-0287
E-Mail: eboggs@cclu.org

21

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed to the following this 8th day of March 2004:

## APPENDIX A

I.  Evaluation of Selected Prisoners at Northern Correctional Institution

CDOC agrees to evaluate certain prisoners at Northern Correctional Institution for serious mental illness, and to remove from NCI those found to be suffering from serious mental illness.

Population to be Evaluated

All prisoners housed at NCI who:

1. Are classified as Administrative Segregation Phase I
2. Are classified as Administrative Segregation Phases II or III, or SRG I, II, or III and have a mental health score of 3 or above
3. Are in any phase of Administrative Segregation or SRG and have a history of psychiatric hospitalization based upon each inmate's most recent NCI Mental Health Intake Form
4. Have been prescribed psychotropic medication within the last 6 months
5. Have been assigned an "S" classification score
6. Have a history of Self-mutilation or suicidal gestures within the last 12 months

Prisoners will be evaluated in the following order:

1. Everyone who has been in Observation in the last month
2. Everyone who has been in Observation twice or more times in the last year
3. Everyone who is prescribed anti-psychotic and/or mood stabilizing medications
4. Everyone who has been in Phase I of the Administrative Segregation program for over 9 months
5. Everyone who is prescribed any psychiatric medication or has been prescribed such medications in the last six months.
6. All others in the categories designated in the settlement agreement.

II.  Definition of Serious Mental Illness

I. For the purpose of the one-time evaluation process of selected inmates currently housed in the CT DOC Northern Correctional Institute at the request of the State of Connecticut Office of Protection and Advocacy:

a. Inmates with a current diagnosis, that takes past psychiatric history into account, of the following disorders that meet DSM-IV criteria, even if there are no current symptoms, and inmates who are currently under treatment for one of these disorders:

1) Schizophrenia
2) Delusional Disorder
3) Schizophreniform Disorder
4) Schizoaffective Disorder
5) Bipolar Disorder, all types
6) Major Depressive Disorder, Current or Recurrent
7) Mental Retardation
8) Organic Mental Disorder (including organic sequelae due to closed head injuries, Dementia, Delirium, Amnestic Disorder, as uncovered by a neuropsychological screening instrument and confirmed by Neuropsychological Testing that lead the individual to significant functional impairment.)
9) Other Psychotic Disorder (including Psychosis NOS) or serious mental illness that is frequently characterized by breaks with reality that lead the individual to significant functional impairment.
10) Severe Personality Disorder that is manifested by frequent episodes of psychosis, results in significant functional impairment, or results in significant or chronic self-injury.

b. Patients with a diagnosis of the following disorders that meet DSM-IV criteria and are currently in the active, symptomatic phase of the disorder, or are under treatment for the following disorders:
1) Brief Psychotic Disorder
2) Substance Induced Psychotic Disorder (excluding intoxication and withdrawal)
3) Psychotic Disorder due to a General Medical Condition

c. Patients who are determined, on the basis of a clinical evaluation, to be actively suicidal or at high risk of suicide in the foreseeable future.

d. Patients who have attempted suicide using lethal means and intending to die, i.e., have engaged in behavior that evidences serious suicidal risk, considering recency, lethality, and intent.

e. Patients who have had active suicidal intent on an ongoing and unremitting basis.

f. Other patients with severe and debilitating symptoms related to the following diagnoses, to include but not limited to: anxiety disorders, including post traumatic stress disorder; dysthymic disorder; cyclothymic disorder; mood disorder secondary to a general medical condition or substance use; and inmates with significant or chronic self injury within the past year, including bona fide suicide attempts. These cases will be reviewed before disposition on a case by case basis by the Director of Mental Health Services.

g. Other exceptional cases approved by the Director of Mental Health Services.

h. Inmates with serious mental illness, as described above, who discontinue psychiatric or mental health treatment against medical advice and remain symptomatic or dysfunctional.

3

III. For the purpose of ongoing screening by the Connecticut Department of Corrections of all inmates prior to placement at the Northern Correctional Institute:

a. through h. in II. above is the same.

## APPENDIX B

Evaluating clinicians

Evaluations will be performed by clinicians employed by the Connecticut Department of Mental Health and Addiction Services ("DMHAS") in accordance with the attached DMHAS written proposal. A written report will be generated by the evaluating clinician on each prisoner evaluated. Reports will be generated on a rolling basis as soon as possible but no later than 10 business days after the evaluating clinicians complete each evaluation and will be provided to the parties as they are generated.

Draft # 2 10/30/03
DMHAS Proposal to Provide DOC-NCI Evaluations Pursuant to CCLU Litigation

### Project
DMHAS will provide diagnostic assessments including current level of functioning assessments of 250 inmates housed in NCI. Providing that 9 evaluations are completed per week and that the project start up will require 8 weeks preparation, this project is estimated to take approximately 10-12 months. The initial anticipated cost of this project is $1 million, not including in-kind contributions of DMHAS to this effort.

### Project Director
The project director will be DMHAS licensed clinical social worker/clinical manager (Betsy Graziano) who will provide a full time in-kind contribution. Her current role of DOC liaison will be temporarily re-assigned to other DMHAS staff. She will work under the direct supervision of Gail Sturges, DMHAS Forensic Director, and will be assigned a full time support staff currently assigned to the forensic division (this will necessitate the hiring of a temp to replace these services). BG will work closely with her counterparts in NCI to ensure cases are scheduled, information is reviewed & available to teams, access to inmates is timely, problems are resolved with the goal of efficiently utilizing the evaluators' time. DOC will provide her with office space at NCI and the full support of the warden and the clinical staff. DOC will provide a senior clinical staff member to partner with BG for the duration of the project.

### DOC Responsibilities
DOC will provide office space to the project director and confidential interviewing room (in close proximity to BG) and will ensure expedited access to inmates scheduled for evaluation (not delayed by counts, etc.) and will maintain the safety of the staff. Per MOU, DOC will provide BG & the evaluators full access to the inmate's custodial file and medical record, unless prohibited by law. DOC will provide a summary of the custodial file prior to the evaluation, which will include information determined relevant to the evaluation (e.g. PSI, disciplinary history, criminal record, etc.). DOC will ensure the availability of a senior clinical staff member on site when a team is scheduled, and will make such person immediately available by phone at all other times.

### Evaluators
In order not to compromise services to DMHAS clients, the following plan does not utilize any DMHAS direct care staff, but instead shifts some forensic evaluations currently provided by DMHAS forensic staff to Yale for the duration of the project, thereby freeing up DMHAS forensic evaluators for this project. Additionally, these DMHAS clinicians are experienced at clinically evaluating criminal defendants and providing forensic reports. They are familiar with DOC, and issues of malingering, secondary gain, character pathology, and conduct disorders. All evaluators will be DMHAS employed (some via the Yale contract) clinicians: LCSWs, APRNs, clinical PhDs, and forensic psychiatrists.

Scope of Evaluation
The evaluators will provide a diagnostic assessment with a focus on psychiatric diagnosis, current mental status and level of functioning. The evaluators will not conclude whether or not placement at NCI is appropriate or harmful to the inmate, or whether the environmental or social conditions at NCI contribute to the diagnosis. Nor will the evaluators assess the quality of mental health treatment provided by DOC to the inmate.

Prioritization of Inmate Evaluations
Inmates will be evaluated with priority given to MH 3's in the most restrictive settings, followed by other MH 3's, then inmates with MH 1 or 2 beginning with those in the more restrictive settings.

Method of Evaluation
The evaluations will be conducted by an interdisciplinary team, which will include a LCSW or APRN, a PhD, and an MD. Such interdisciplinary teams have been successfully utilized for many years in performing competence to stand trial evaluations and result in more comprehensive assessments in shorter periods of time, and enhanced ability to distinguish cases in which further testing is indicated, as well as greater precision in framing the test question or issue. The evaluation will consist of three components:
(1) Current behavioral assessment: Developed collaboratively by BG & assigned DOC staff. Will consist of a review of the DOC custodial and medical record files, interviews with infirmary and CO's to obtain observations, program staff to determine level of participation, interactional strengths and weaknesses. A standardized summary will be provided to the team prior to the interview
(2) Clinical interview by multidisciplinary team: Team will review current behavioral assessment and the medical record (custodial file also provided at time of interview); conduct a standard clinical diagnostic interview (biopsychosocial history, psychiatric/substance abuse history, medication history, mental status exam). The team will determine if additional testing is necessary based on this assessment.
(3) Current MMPI performed by DOC: DOC will arrange to have current MMPI's done on all inmates being evaluated (except those who are not sufficiently literate), including testing for Spanish speaking inmates. DOC will provide the MMPI report to the team in a timely manner. If recommended by the evaluators DMHAS will provide any additional psychological testing, but other testing (e.g. medical, neurocognitive or neurological) will be provided by DOC, with the findings provided to the team. If necessary, evaluators may interview DOC custodial or treatment staff for more information.

If an inmate refuses to participate, BG will attempt to elicit the inmate's cooperation. Failing that, pursuant to the MOA the evaluators will review the records described above and will provide a report based on that information. In appropriate cases, the team may ask to be escorted to the inmate's cell to observe his appearance & behavior, and/or may interview DOC staff and consider those observations.

Report

The evaluators will prepare a report based on an agreed upon format. Any evaluator may write the report on behalf of the team. Signature by any team member implies the review & approval of all participating evaluators. Reports will be provided to DOC as completed.

Procedure

Phase 1:
(1) Establish an MOA (involve AGs representing both agencies to deal with Hipaa, liability of evaluators, scope of responsibilities, notice to inmates, etc.) Estimated time: 8 weeks
(2) Develop evaluation protocols. Estimated time: 8 weeks
- Clinical interview structure
- Team composition & schedule
- Training and orientation of DMHAS staff
- Report format
- Develop data base & documentation process
- Re-allocation of current DMHAS resources
- Increase allocation to OCE's for use of per diems
- Transfer funds to Yale contract to support reassignment of work
- DOC coordination (assignment of space & support, developing a pre-evaluation record summary, inmate access protocol, identification of inmates based on prioritization schedule

The DMHAS Project Steering Committee (KM, GES, BG, TMK, PA, Madelon, Sue D.) will develop the above, with input as needed from DOC staff. An Interagency Project Oversight Committee, co-chaired by the Commissioners of DMHAS and DOC, will provide final review.

Phase 2: Implementation
(1) Prioritization & scheduling of inmates
(2) 3 teams per week (no more than 1 team daily) scheduled to interview 3 inmates per day (9/wk)
(3) MMPI testing plan developed and implemented by DOC
(4) Psychological & other testing as determined by team
(5) Reports completed and provided to DOC upon completion
(6) DMHAS Project Steering Committee to meet weekly, monitor & modify protocols as needed
(7) Periodic meetings of Interagency Oversight Committee to assess and monitor progress

Phase 3: Final Report and Documentation. Project completed

## APPENDIX C

A.D. 6.5, Use of Force – REVISED – 2/28/03
Prepared for signature 3/3/03 – effective 3/5/03

* * * *

9.  Therapeutic Restraints. Restraints shall be used only in situations that are directly proportionate to the presence of imminent physical danger to the inmate, others or the environment.

A.  No On-Site Health Services Staff. Placement of an inmate in full stationary restraints shall be in accordance with this Directive. Soft restraints shall be used. The placement shall require an order from the on-call psychiatrist or physician within one (1) hour.

B.  On-Site Health Services Staff.

1.  Criteria. An order to restrain shall be subsequent to an evaluation by a physician. If a physician is not on-site, an assessment shall be made by a Registered Nurse with a telephone order obtained within one (1) hour from a physician and so documented. The physician may discontinue restraints subsequent to a direct evaluation. In the absence of a physician, a Registered Nurse may discontinue restraints with a telephone order from a physician.

2.  Equipment. Restraint equipment shall be approved by the Director of Health, Mental Health and Addiction Services and shall be maintained in accordance with Administrative Directive 7.2, Armories.

3.  Cell Condition. Wherever possible, the authorized restraint bed shall be placed in the middle of the room away from the walls to prevent injury of staff and inmates during placement. The cell shall also be free of obstruction to allow for clear observation of the inmate.

4.  Procedure. This process shall be video recorded in accordance with Section 16 of this Directive. A video recording shall be designated to each inmate while on full restraint status and the video recording shall be utilized at least during placement, each (2) hour check, during any notable change in behavior and removal of restraints.

    This procedure shall be implemented in collaboration with supervising custody staff. The inmate shall be placed on a mattress, which is positioned on top of a bed frame and the inmate shall be positioned face up. Arms and legs shall be restrained such that discomfort to the inmate is minimized.