**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| STATE OF CONNECTICUT OFFICE | : | CIVIL ACTION NO. 3:03CV1352 (RNC) |
| OF PROTECTION AND ADVOCACY, | : | |
| ET AL., | : | |
| *Plaintiffs* | : | |
| | : | |
| v. | : | |
| | : | |
| WAYNE CHOINSKI, ET AL., | : | |
| *Defendants* | : | JUNE 30, 2004 |

<u>**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR AN ORDER ALLOWING ACCESS TO PRISONER HEALTH RECORDS**</u>

**I.**     <u>**INTRODUCTION**</u>

The defendants, Wayne Choinski, Giovanny Gomez and Theresa Lantz, submit this memorandum in opposition to the plaintiffs' motion seeking court-ordered access to inmate medical and mental health records without affording the inmates at issue notice and an opportunity to object to such access.  As shown below, the plaintiffs' request deprives the affected inmates of their constitutionally protected privacy rights, violates well-established state and federal privileges, and exceeds the authority conferred upon the plaintiffs by their own state and federal enabling legislation.  The plaintiffs' request, coupled with their refusal to even apprise the inmate population of their intentions, leaves the persons most affected by the request, the inmates, without a voice in these proceedings.  Accordingly, the plaintiffs' motion should be denied, and only records for which the plaintiffs produce signed releases should be disclosed.

Alternatively, the defendants submit that the inmates who are the subject of the plaintiffs' motion, but are not represented by the plaintiffs, should be given notice of these proceedings and the plaintiffs' request, and an opportunity, through appointed counsel, if necessary, to brief these issues before the court decides the motion.

## II.     FACTUAL BACKGROUND

The plaintiffs, Office of Protection and Advocacy For Persons With Disabilities and James McGaughey (hereinafter collectively referred to as "plaintiffs" or "OPA") have filed a motion seeking resolution of an issue that the parties could not resolve during extensive, constructive discussions resulting in an agreement to settle this litigation.  See Settlement Agreement, appended to plaintiffs' June 9, 2004 Memorandum as Ex. A.  Of course, the reason this issue, preservation of confidentiality and expectations of privacy regarding records of medical and mental health care, was not resolved during negotiations is because the parties to this litigation do not actually represent the inmates who are impacted by the plaintiffs' broad demand for medical file review.  To fully appreciate the interests of the parties to this action, the rights of the inmates affected by the plaintiffs' request, and the efforts over the last eighteen months to accommodate the plaintiffs' interests and the rights of the inmates who are the subject of plaintiffs' inquiries, the defendants provide the following factual record and analysis of applicable statutes and case law.  As shown below, the constitutional and statutory rights of inmates, and in many instances the viability of the doctor-patient relationship, will be severely eroded by following plaintiffs' suggested course of action.

### A.  The Plaintiff, Office Of Protection And Advocacy, Is A Creation Of Federal And State Statutes With Limited Authority

First, it is important to appreciate the purpose of, and limitations placed upon, the plaintiff agency.

The Connecticut legislature created OPA to further the State's "special responsibility for the care, treatment, education, rehabilitation of and advocacy for its disabled citizens."  C.G.S. Section 46a-7.  In this enabling legislation, the legislature expressly stated that "[i]t is hereby declared policy of the state to provide for coordination of services for the disabled among the

various agencies of the state charged with the responsibility for the care, treatment, education and rehabilitation of the disabled." *Id.* The State's statutory scheme creates the position of Director of the Office of Protection and Advocacy, and authorizes the director to, inter alia, "[r]equest and receive information, including personal data, concerning a person with a disability from any state or private agency, *with the consent of such person with a disability, or the parent or guardian of such person, as appropriate.*" *See* C.G.S. Section 46a-11(5)(emphasis added). Plaintiff seeks to avoid these obligations by obtaining an order from this court relieving it of these clear statutory limitations.

Similar statutory and regulatory limitations appear in the federal legislation creating and funding protection and advocacy systems nationwide. Pursuant to 42 U.S.C. § 10801, Congress sought to create a system of protection and advocacy for persons with mental illness to "ensure that the rights of individuals with mental illness are protected . . . and to assist States to establish and operate a protection and advocacy system for individuals." This system is empowered to "investigate incidents of abuse and neglect of mentally ill individuals if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred.[1]" These powers are limited, however, by the express finding of Congress that "family members of individuals with mental illness play a crucial role in being advocates for the rights of individuals with mental illness." See 42 U.S.C. section 10801(a)(2). *Office of Protection and Advocacy v. Armstrong*, 266 F. Supp. 2d 303, 310 (D. Conn. 2003).

---

[1] In this case, there are no admissions in the Settlement Agreement that the constitutional rights of any inmates were violated, and it is explicit that "the policies and procedures outlined herein do not define clearly established constitutional rights of inmates." Settlement Agreement, Plaintiffs' Ex. A at 2, ¶3.

The federal scheme referred to herein collectively as the PAIMI statutes, but most notably its predecessor, the Developmental Disabilities Assistance and Bill of Rights Act (hereinafter "DDA")[2/], were enacted as the direct result of Congressional concern for living conditions in a New York institution for persons with developmental disabilities. See generally, *Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Center*, 97 F.3d 492, 494 (11th Cir. 1996).   In the text of the PAIMI statutes, Congress created two remedies for P & A agencies seeking access to records or clients.  First, Congress conditioned its payment of federal funds to the States for the provision of services to persons with disabilities upon the establishment of a system for providing a "protection and advocacy program for disabled persons."  *See* 42 U.S.C. § 10801, et seq.   More germane to this action, Congress also empowered the local protection and advocacy systems with the authority to investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe the incidents occurred, and to initiate legal action "to ensure the protection of individuals with mental illness who are receiving care or treatment in the State."  42 U.S.C. section 10805 (a)(1).  In furtherance of its responsibilities, OPA may have access to records of an individual "who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access."  42 U.S.C. section 10805(a)(4)(A)[3/].  Protection and advocacy systems are only empowered to obtain records without properly executed releases in instances where individuals have died or are otherwise incapable of executing a proper release.  See 42 U.S.C.

---

2/       See 42 U.S.C. section 6000, et seq.

3/       In this case, the plaintiffs do not claim that any of the individuals currently incarcerated in the facilities at issue are or were clients of OPA.

Section 10805(a)(4)[4].  Critically, the authority of OPA to investigate any claims under PAIMI must be predicated upon the individual in question meeting the definition of the term "individual with mental illness" which, pursuant to PAIMI means "an individual . . . who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State; and . . . [1] who is an inpatient or resident in a facility rendering care or treatment; [2] is in the process of being admitted to a facility rendering care or treatment. . . ; or [3] who is involuntarily confined in a municipal detention facility for reasons other than serving a sentence resulting from conviction for a criminal offense. . . .[5]"  42 U.S.C. section 10802(4); *OPA v. Armstrong*, 266 F. Supp. 2d at 311.  None of these limitations on OPA's authority is discussed in its memorandum of law in support of motion for access to records.

Certain of the aforementioned statutory provisions are also discussed in federal regulations promulgated to enforce PAIMI.   The definitions of "abuse", "neglect" and "individual with mental illness" are virtually identical in the regulations and the statute.   The

---

4/      "Abuse" is defined in PAIMI as "any act or failure to act by an employee of a facility rendering care or treatment which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which caused, or may have caused, injury or death to an individual with mental illness."  Similarly, "neglect" is defined as "a negligent act or omission by an individual responsible for providing services in a facility rendering care or treatment which caused or may have caused injury or death to an individual with metal illness or which placed an individual with mental illness at risk of injury or death. . . ."  Both definitions provide examples of what may constitute abuse or neglect.  See 42 U.S.C. section 10802(1) and (5).  There  is not a statutory definition of probable cause within the PAIMI Act.

5/      In its complaint, the plaintiff alleges that the six individuals "are all believed to have been recipients of mental health services or committed suicide at the DOC and are thus eligible for services under PAIMI."  See Complaint at para. 9.  With the exception of one former inmate,  (whose records have been provided to P & A), there are no factual contentions to support this "belief" nor are there any factual statements in the affidavit of Susan Werboff to establish that any of the inmates met the definition of an "individual with mental illness."

regulations add the following definition of "probable cause": "reasonable grounds for belief that an individual with mental illness has been, or may be at significant risk of being subject to abuse or neglect. The individual making such determination may base the decision on reasonable inferences drawn from his or her experience or training regarding similar incidents, conditions or problems that are usually associated with abuse or neglect."  See 42 C.F.R. Part 51.2.

Thus, the statutes and regulations governing OPA's operations do not permit a blanket fishing expedition, but rather, place conditions on file review and interviews upon an individualized finding of probable cause and the obtaining of consent.  Moreover, OPA's right to investigate any aspect of institutional activity is limited to a probable cause finding that an individual has been subjected to abuse or neglect.  In making its motion for disclosure of records in this case, plaintiff acknowledges none of these statutory limitations.

**B. Events Preceding Commencement Of This Litigation Demonstrate That Obtaining Releases From Inmates Prior To OPA Interviews And File Reviews Is Not Burdensome And Accommodates Inmate Privacy Rights**

When the defendants assert that the plaintiffs do not "represent" the interests of the inmates whose constitutional and statutory rights are ignored by the pending motion, the defendants base this conclusion on two separate grounds.  The first, quite simply, rests on the position taken by the plaintiffs and their counsel throughout settlement discussions and the absence of any efforts on the part of the plaintiff to certify a class in this action.  The second, as demonstrated below, is established by the process for inmate interviews and file reviews agreed to by the parties prior to the commencement of this litigation.  The experience of DOC and OPA in this regard should inform the discussion over the degree of consideration, and process of accommodation, that should be given to the rights of the inmates affected by, yet not informed of, these proceedings.

## 1.  This Is Not A Certified Class Action

In their memorandum, the plaintiffs rely upon *Doe v. Meachum* 126 F.R.D. 444 (D. Conn. 1989) for the proposition that records can be disclosed to the attorneys and their experts in this case.  *Doe* was a certified class action, unlike this case, and releasing records to the attorneys who represent a certified class is distinguishable from the disclosure at issue here, where the plaintiffs are neither attorneys for any particular class of inmates, nor do they represent any individual inmates.  In effect, disclosure here is sought from non-parties to the litigation who have neither consented nor been given notice of the pending motion.

In *Doe v. Meachum* releasing the records to class counsel was only authorized after the adequacy of class counsel's representation was determined and the class was certified.

The court's review of the  adequacy of  counsel,  far from being a collateral issue, is central to a finding of adequacy of representation, a necessary condition to class certification. *Cullen v. New York State Civil Service Com*,  566 F.2d 846, 848 (2d Cir 1977) In *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555 (2d Cir. 1968), the Second Circuit said "an essential concomitant of adequate representation is that the party's attorney be qualified, experienced and generally able to conduct the proposed litigation." 391 F.2d at 562.  Since absent class members are conclusively bound by the result of an action prosecuted by a party alleged to represent their interests, the court's selection of counsel for the absent class should be guided by the best interests of those members, not the entrepreneurial initiative of the named plaintiffs' counsel.  In making a class certification decision, a district court must frequently select as lead counsel for the class  the attorney who will best serve the interests of its members.  And the court may also find it necessary to appoint additional counsel to protect the interests of subclasses. See 7 Wright & Miller, *Federal Practice and Procedure,*  Civil @ 1765 at 617-623 (1972);  1 *Moore's Federal  Practice*, Part 2, @1.44 at

50-51 (2d ed. 1977); *Amos v. Board of Directors of City of Milwaukee*, 408 F. Supp. 765 (E.D.

Wis.), aff'd, 539 F.2d 625 (7th Cir. 1976); *Cullen v. New York State Civil Service Com*, 566

F.2d at 848 – 849.

In *Doe v. Meachum,* the plaintiffs, were a certified class of "all persons who were at any time

since August 15, 1985, are, or will be subject to the care and custody of defendant Larry

Meachum, Commissioner of the Connecticut Department of Correction, but excluding those

individuals in the class certified in *Smith v. Meachum*, Civ. No. H87-221 (JAC). " These

persons challenged the defendants "red-dot policy" on various grounds, including alleging

violations of the plaintiffs' right to privacy.  The settlement of *Doe v. Meachum* resulted in a

consent decree requiring, in part,  confidentiality of records, resolving the claims of lack of

privacy.  This Consent Decree was  entered by the Court, pursuant to Rule 23(e) Fed. R. Civ.

P., only after giving fair notice to all inmates in all facilities, providing reasonable time and

opportunity to object, and after a "fairness hearing" was conducted by the Court. *See e.g.*

*Marisol A. ex rel. Forbes v. Giuliani,* 185 F.R.D. 152 (S.D.N.Y. 1999).  The defendants in *Doe*

*v. Meachum* gave notice to all inmates in all DOC facilities of the proposed settlement, and

notified all inmates that their records would be disclosed to a monitoring panel that was going

to conduct audits for consent decree compliance.  Inmates  could opt out, such as the inmate

plaintiff in *Doe v. Blake,* 809 F. Supp. 1020 (D.Conn. 1992).  Inmates could also object to the

settlement or file other objections to the disclosure of records provision or any other provisions

of the consent decree.

In this case, however, plaintiffs have refused to notify the inmates, in a letter they have

sent to the inmates at Northern and Garner, that their confidential medical and mental health

records will be disclosed to the plaintiffs, and the auditors. *See*  OPA Letter To Inmates, Ex. A;

8

Exchange of Email Messages Between Attorneys Solnit and O'Neill, Ex. B.   The plaintiffs similarly do not consent to the giving of notice to all inmates and allowing them to object to disclosure, and requiring written releases for the authorization of records, which is not only required by state and federal law, but with respect to HIV information contained in any of the health records at issue, is also required as a matter of a Court Order entered by Judge Cabranes, when he approved and so ordered the Consent Decree in *Doe v. Meachum*.  It could be claimed by class members in *Doe v. Meachum* that disclosure of records without consent of the "protected individual" inmate is thus not only a violation of Conn. Gen. Stat. §19a-583, thereby exposing the defendants to potential money damages claims under §19a-590, but also that it constitutes a violation of a federal court order approving and entering the Consent Judgment, after a fairness hearing over the objections of the persons who filed timely objections.  There are no such procedural protections for the non-party inmates in this case. Indeed, no one is representing or speaking up for the inmates in response to the pending motion.

### 2.  Releases Were, And Continue To Be, Easy To Obtain

In the Spring of 2002, OPA approached DOC requesting a tour of the two facilities at issue in this litigation. See 3/27/02 Letter From Atty. Alisberg to Commr. Armstrong, Ex. C. The letter made specific reference to OPA's authority and obligations under PAIMI, including the manner in which OPA may review records with the consent of inmates.  See Id. at p. 1.  The letter further indicated that its inspections would include inmate interviews, but that they "will only speak with prisoners who consent to be interviewed."  Id. at p. 2.  Then-DOC Commissioner John Armstrong responded to OPA's letter by, inter alia, insisting that OPA

obtain written releases, and promised to facilitate distribution of letters and forms to accomplish this task.  See 5/8/02 Letter from Commr. Armstrong to Atty. Alisberg, Ex. D at p. 2.

After significant compilation and production of information, the defendants and OPA reached an agreement regarding review of documents and conducting of tours and inmate interviews.  As part of this agreement, on October 21, 2002, staff at Northern Correctional Institution distributed a package of documents, including releases and an introductory letter from OPA, to categories of inmates identified by OPA, and on November 5, 2002, OPA staff traveled to Northern and collected the releases.  See Affidavit of Christine Whidden, Ex. E at ¶¶ 3, 4, Release Package, Ex. F.  During the collection process, OPA staff were allowed to speak with persons who refused to provide consent in an effort to persuade them to participate.   Whidden Affid., Ex. E at ¶ 7.  Thereafter, DOC and OPA staff met jointly to review the releases to document who consented and who refused.  Id. at ¶ 6.  OPA expressed its appreciation for the manner in which Northern staff accommodated them and assisted in the obtaining of releases. See 11/6/02 Letter from Attorney Alisberg to Major Whidden, Ex. G.  Staff at NCI generally kept their distance from the discussions between OPA staff and the inmates, and no one recorded the reasons given for inmate refusals.  See Whidden Affidavit, Ex. E at ¶ 5.[6]

Thereafter, in a letter to DOC, OPA set forth the process by which interviews and tours would be conducted at each facility.  The interviews and file reviews were limited to inmates who consented in writing to the process.  See 3/4/03 Letter From Atty. Alisberg to Patricia Ottolini, Ex. H at pp. 1-2 (attachments identifying specific inmates omitted).   At the conclusion of the tours and inmate interviews, Attorney Alisberg expressed her appreciation for the cooperation of DOC staff.  See 3/31/03 Letter from Attorney Alisberg to Commissioner Lantz,

Ex. I.  At no time during the interview and inspection process did OPA object to the requirement that its staff produce releases prior to interviewing inmates or reviewing medical files.

At Northern, 122 inmates consented in writing to participate in the OPA review process while 89 refused.  See Whidden Affid., Ex. E at ¶ 6.

The considerable number of individuals who refused to participate in the pre-litigation screening process may be attributable to a number of causes, a discussion of which would be speculative at best.  However, the number is significant because it demonstrates that 2 out of every 5 inmates at NCI who were asked to participate in OPA's review refused to do so.   These inmates, who are not part of a class requested by the plaintiff agency, much less certified by this court, are entitled to the same respect for their privacy that was provided when OPA began its review more than two years ago.

> **C.  The Opinions Of Mental Health Providers Currently Treating The Inmate Population Support The Conclusion That Disclosure of Records Without Consent Of The Patient Can Be Harmful To The Individual Patient And The Doctor-Patient Relationship**

Appended hereto are the affidavits of Drs. Martin Paul Chaplin and Man Liu, who are supervising psychologists at Northern and Garner, respectively.  As demonstrated in these affidavits, it is clear that proceeding in the fashion suggested by plaintiffs will needlessly undermine the doctor-patient relationships that have, with considerable difficulty, developed in the two prisons at issue.

As reported by Dr. Chaplin, the supervising psychologist at Northern, his facility's complement of mental health staff includes a licensed psychiatrist, psychologist, advanced practice registered nurse, a nurse clinician and several social workers who see inmates with

---

[6] A similar process was followed at Garner, but involving fewer inmates.  Garner has not retained records of their obtaining of releases for the OPA visit in March 2003.

mental health issues.  Affid. of Dr. Chaplin, Ex. J at ¶¶ 2-4.  The mental health treatment staff at

Garner is substantial, consisting of 2 supervising psychologists, 3 psychiatrists, an APRN, 12

social workers and 5 other full-time mental health workers assisting in recreation, developmental

issues and nursing.  Affid. of Dr. Liu, Ex. K at ¶ 5.  At both facilities, inmates suffering from

mental illness are seen virtually every day during tours of the facility by one or more of the

above-referenced staff, and at assigned intervals for full evaluations and tracking of medications.

See Affidavits of Dr. Chaplin at ¶¶  5-8; Affid. of Dr. Liu at ¶¶ 11-12.

In the opinion of Dr. Chaplin, many of the inmates at NCI "are mistrustful of government

authority and have strongly negative opinions about government officials (including those from

OPA) having access to their confidential medical records."  Chaplin Affid. at ¶ 9.  Although Dr.

Chaplin regularly advises patients to give consent for OPA evaluations, many refuse.  Id.  Dr.

Chaplin recounts one experience with an inmate who has, after several months of hard work, has

begun to share painful concerns and who has said he will no longer participate in therapy if his

files are disclosed; critically, this particular inmate engages in suicidal behavior.  Id.  Dr. Chaplin

further opines that similar behavior should be expected from other inmates should records be

disclosed without their permission "to punish the system for interventions against their will."  Id.

In light of the nature of the "painful memories" that are shared between doctor and patient in a

correctional facility, Dr. Chaplin is "strongly opposed to opening up of the charts because of the

potential loss of trust in mental health professionals and the potentially disruptive behavior that it

might cause."  Id. at ¶¶10, 11.

At Garner CI, which now houses most of the severely mentally ill inmates in the

Connecticut correctional system, similar concerns are at the forefront of the doctors' objections

to the plaintiffs' proposed review.  In addition to general mistrust of government officials and the

harms caused by unauthorized access to inmate records, Dr. Liu, is of the opinion that "[n]ot allowing the mentally ill inmates to exercise their rights and to safeguard their own medical information would likely intensify the distrust among these inmates toward the government officials and advocating agencies such as OPA . . . [and] potentially erode the trust between the service providers and inmates and make a clinically contra-indicated impact on their care and services." Liu Affid., Ex. K at ¶¶ 13. 17.

Given these facts, and the constitutional, federal common law and state statutory rights of the non-party inmates that are implicated by the plaintiff's request, the defendants object to the plaintiffs' motion. The relief sought by the plaintiff is unprecedented, and disregards proven alternatives that accommodate the interests of all concerned. At the very least, plaintiffs' request should be held in abeyance until the position of the inmates, through appointed counsel or the inmates themselves, is presented to this court.

### III.   ARGUMENT

#### A.  Plaintiffs' Proposed Order Ignores Virtually All Of The Constitutional And Statutory Rights Of Privacy That Assure The Confidentiality Of Medical And Mental Health Records

Here, plaintiffs propose that the plaintiffs' consultants, attorneys and the plaintiffs themselves all should have access to medical and mental health records of presumably all inmates at Northern Correctional Institution ("NCI") and Garner Correctional Institution ("Garner"). [7] The plaintiffs make this novel proposal despite following a procedure consistent with applicable state and federal law prior to filing suit,  when plaintiffs first undertook an

---

[7]   The terms of the agreement only govern conditions at NCI's administrative segregation program, NCI's observation cells and the units at Garner where prisoners are housed due to mental illness or impairment.  The plaintiffs do not explain in their motion or supporting papers

investigation of NCI, Garner and the mental health and medical condition of inmates housed

therein.  As noted above, the plaintiffs, as part of their preparations for this suit, sent out releases

for inmates to sign, authorizing the review of their medical and mental health files by plaintiffs,

and their consultant.[8]   Plaintiffs have indicated they will not seek releases again from inmates at

NCI and Garner, and give no reason why they should not or cannot do so.  Similarly, plaintiffs

do not propose that any sort of notice be given to the inmate population at NCI and Garner

advising the inmates that plaintiffs are seeking an order allowing them and their consultants

access to the inmates' medical and mental health files.  Indeed, the plaintiffs refused a request to

apprise the inmates at these two facilities despite the fact that plaintiffs counsel have prepared a

letter informing this very same inmate population of other aspects of the agreement resolving this

litigation.[9]

Because the defendants are responsible for the provision of medical and mental health

care for the inmates and are the custodians of their medical records, they respectfully object to

plaintiff's motion.  *United States of American v. Westinghouse Electric Corporation*, 638 F.2d

570 (3rd Cir. 1980)(Employer properly raised privacy interests of employees in employee

medical records);  *Cook v. Yellow Freight System, Inc.*, 132 F.R.D. 548, 551 n.2 (E.D.Cal.

1990)("[A] custodian of private information 'has the right, in fact the duty, to resist attempts at

---

why they, their experts and attorneys would need or would be entitled to all the medical and
mental health records of everyone at NCI and Garner.

[8]   Indeed, according to OPA's 2002 Annual Report, approximately 120 prisoners signed releases
indicating that they would like P&A to review mental health treatment plans.  OPA Annual
Report page 14 attached hereto as Ex. L.

[9] Admittedly, the plaintiffs have provided the inmate populations at Garner and Northern with
copies of the agreement.  The issue of disclosing confidential health records appears only in one
sentence on the seventeenth page of the agreement.  Critically, plaintiffs make no mention in
their two-page letter touting the benefits of the agreement, nor have they taken any steps to
apprise the inmate population of their pending motion, thereby foreclosing any opportunity for
the inmates to express their views on this request before the entry of a court order.

unauthorized disclosure and the person who is the subject of the record is entitled to expect that his right will be thus asserted."").

### B.  The inmates at NCI have a constitutional right to privacy in their Medical Records

The Supreme Court has recognized a privacy interest in the confidentiality of one's medical records, derived implicitly from the Fourteenth Amendment to the United States Constitution.  *Whalen v. Roe*, 429 U.S. 589, 599-600, 51 L. Ed. 2d 64, 97 S. Ct. 869 (1977); *Doe v. Attorney General of U.S*., 941F.2d 780, 795-96 (9th Cir. 1991) (establishing that information regarding a person's HIV status would fall within the ambit of the privacy protection afforded medical information); *Caesar v. Mountanos*, 542 F.2d 1064, 1067 n.9 (9th Cir. 1976), *cert. den*. 430 U.S. 954, 51 L. Ed. 2d 804, 97 S. Ct. 1598 (1977) (holding that right to privacy encompasses doctor-patient and psychotherapist-patient relationship).  In *Barry v. New York*, 712 F.2d 1554, 1559 (2d Cir.), *cert. denied*, 464 U.S. 1017 (1983), the Court of Appeals for the Second Circuit characterized these types of privacy interests as "interests in 'confidentiality' and in 'autonomy', respectively." "The right to be let alone" is "the right most valued by civilized men."  *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928)(Brandeis, J. dissenting).

In *Doe v. City of New York*, 15 F.3d 264, 266 (2 Cir. 1994) the Second Circuit Court of Appeals held that "individuals who are infected with the HIV virus clearly possess a constitutional right to privacy regarding their condition."  The Second Circuit further stated:

> Medical information was the subject  of the Third Circuit's opinion in *United States v. Westinghouse Electric Corp.*, which recognized that "information about one's body and state of health is a matter which the individual is ordinarily entitled to retain within the 'private enclave where he may lead a private life.' [citations omitted]. . . . Extension of the right to confidentiality to personal medical information recognizes there are few matters that are quite so personal as the status of one's health, and few matters the dissemination of which one would prefer to maintain greater control over.  <u>Clearly, an individual's choice to inform others </u>that she has contracted what is at this point invariably and sadly a fatal,

> incurable disease <u>is one that she should normally be allowed to make for herself.</u>
> <u>This would be true for any serious medical condition,</u> but is especially true with
> regard to those infected with HIV or living with AIDS, considering the
> unfortunately unfeeling attitude among many in this society toward those coping
> with the disease.

*Doe v. City of New York*, 15 F.3d at 267 (emphasis added);  *See also Powell v. Schriver*, 175

F.3d 107, 111 (2d Cir. 1999)(Inmate had a constitutional right to privacy in his transsexualism);

*Schwenk v. Kavanaugh*, 4 F. Supp. 2d 100 (N.D. N.Y. 1998)(Finding that District Attorney's

office violated accused's constitutional right to privacy when it subpoenaed his records from an

involuntary commitment to a psychiatric facility).

Here, the inmates at Northern and Garner have a constitutional right to keep their medical

and mental health records private and confidential.  Plaintiffs seek an order from this court that

would allow plaintiffs and their experts access to inmate medical and mental health records,

without said inmate's consent or even knowledge.  This court should not allow plaintiffs to

trample over individual inmate privacy rights in such a fashion.  Indeed, such an order would

undermine any trust that inmates have of mental health staff and chill their willingness to talk

about painful issues that underlie mental health problems. See affidavit of Dr. Paul Chaplin

attached hereto as Ex. J at ¶¶ 9-11; Affidavit of Dr. Man Liu, Ex. L at ¶¶ 14-17.   At  a

minimum this court should order that the inmates at Northern and Garner be notified of

plaintiffs' motion and be given an opportunity, either pro se or through appointed counsel, to be

heard with regard to plaintiffs' motion.

### C.  The inmates at NCI have a Federal Common Law Privilege Prohibiting the Disclosure of their Communications with Mental Health Workers

Fed. R. Evid. 501 reads in relevant part:

> Except as otherwise required by the Constitution of the United States or provided
> by Act of Congress or in rules prescribed by the Supreme Court pursuant to

statutory authority, the privilege of a witness, person, government State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

Federal common law recognizes a psychotherapist-patient privilege.  Jaffee v. Redmond, 518 U.S. 1, 15, 116 S.Ct. 1923, 135 L.Ed. 2d 337 (1996).  "[C]onfidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence."  Id.

In Jaffe, the administrator of the estate of a man whom the respondent shot and killed sued the respondent.  During pretrial discovery, the petitioner learned that after the shooting the respondent had participated in about 50 counseling sessions with an Illinois licensed clinical social worker.  Petitioner sought access to the notes for cross examining respondent.  Respondent objected.  The district court rejected the argument that the notes were protected by a psychotherapist-patient privilege.  On appeal, the Seventh Circuit reversed but "qualified its recognition of the privilege by stating that it would not apply if 'in the interests of justice, the evidentiary need for the disclosure of the contents of a patient's counseling sessions outweighs that patient's privacy interests.'"  Id at. 1926-27.  Upon granting of certiorari, the United States Supreme Court affirmed, and went on to hold that there was an absolute privilege between a licensed psychotherapist and her patient.  First, in recognizing the need for a privilege between a psychotherapist and patient, the Supreme Court stated:

> [T]he question we address today is whether a privilege protecting confidential communications between a psychotherapist and her patient 'promotes sufficiently important interests to outweigh the need for probative evidence' [citation omitted].  Both 'reason and experience persuade us that it does. Like the spousal and attorney-client privileges, the psychotherapist-patient privilege is 'rooted in the imperative need for confidence and trust.' [citation omitted]. . . . Effective psychotherapy, by contrast depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears.  Because of the sensitive nature of the problems

17

for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace.  For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.  . . . If the privilege were rejected, confidential conversations between psychotherapists and their patients would surely be chilled. . . Without a privilege, much of the desirable evidence to which litigants such as petitioner seek access. . . is unlikely to come into being.  This unspoken evidence will therefore serve no greater truth-seeking function than if it had been spoken and privileged.  . . . we hold that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence. . . . We have no hesitation in concluding in this case that the federal privilege should also extend to confidential communications made to licensed social workers in the course of psychotherapy.  The reasons for recognizing a privilege for treatment by psychiatrists and psychologists apply with equal force to treatment by a clinical social worker. . . .We therefore agree with the Court of Appeals that drawing a distinction between the counseling provide by costly psychotherapists and the counseling provided by more readily accessible social workers serves no discernible public purpose.

*Jaffee v. Redmond*, 116 S.Ct at  1928, 1929, 1931.

The Supreme Court then went further than the Seventh Circuit, finding that the privilege was absolute and not subject to any sort of balancing test:

We part company with the Court of Appeals on a separate point.  We reject the balancing component of the privilege implemented by that court and a small number of States.  [footnote omitted].  Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege.  As we explained in *Upjohn*, if the purpose of the privilege is to be served, the participants in the confidential conversation 'must be able to predict with some degree of certainty whether particular discussions will be protected.  An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.'

*Id*. at 1932 (citation omitted).

More recently, a district court refused to order the disclosure of non-party group therapy notes in *Perez v. City of Chicago*, 2004 U.S. Dist Lexis 7415 (N.D.Ill. 2004).  There, plaintiff had sued the City of Chicago police department alleging excessive force and illegal detention.

Defendants served a subpoena seeking medical charts which reflect group therapy sessions.  The non-party Perez  family members objected.   The court held that the non-party information could not be disclosed.

> *Jaffe* protects all psychotherapist-patient communications from disclosure regardless of relevance.  Relevance is not the standard for determining whether information should be protected from disclosure as privileged. [citation omitted].  By definition, a privilege "prevents disclosure of information that may be relevant in the case, in order to serve interests that are of over-arching importance."

*Perez v. City of Chicago* 2004 U.S.Dist Lexis 7415 at *10.

In the case at bar, plaintiffs do not discuss *Jaffe* but rather cite to pre-*Jaffe* case law in support of their position that they are entitled to inmates' health records without their consent.  See Plaintiffs' brief at pp. 12-13.  Plaintiffs cite these cases for the proposition that this court should perform a balancing test  and find that the public interest in vindicating civil rights outweighs individual privacy interests.  However, the balancing test discussed in these cases is no longer valid when talking about communications between a psychotherapist and patient after the 1996 *Jaffe* decision.

With regard to the individual inmates' constitutional right to privacy, plaintiffs suggest on page 11 of their brief that the court need not consider this line of cases because they are "pre-HIPAA."  Plaintiffs argument that HIPAA eradicated the federal common law psychotherapist-patient privilege or a patient's constitutional right to privacy in his medical records  is without merit, unsupported by case law and legally unsound.

Indeed, in a case cited and relied upon by the plaintiffs, the Seventh Circuit stated:

> Rule 501 in terms makes federal common law the source of any privileges in federal-question suits unless an Act of Congress provides otherwise.  We do not think HIPAA is rightly understood as an Act of Congress that creates a privilege.

*Northwestern Memorial Hospital v. Ashcroft*, 362 F.3d 923, 926 (7th Cir. 2004).

HIPAA simply prohibits a health care provider from disclosing or using individually identifiable health information. 45 C.F.R. §§ 160.103, 164.502. HIPAA contains an exception to its prohibition against the release of medical information if a court orders the release of said information. 45 C.F.R. §164.512(e). However, HIPAA does not affect the existing standards that the courts are to employ in determining whether such an order should issue. More specifically, HIPAA did not and could not eradicate an individual's *constitutional right* to privacy in his medical records or his federal common law privileges. Rather, a court's order under HIPAA still must comply with all other federal constitutional and common law requirements. All § 164.512 provides is that HIPAA does not prevent the court from ordering disclosure of records that otherwise *under HIPAA* could not have been disclosed.

Here, several inmates are seen at a minimum of every 90 days by a psychologist. In addition, if an inmate is on psychotropic medication, he is seen once a month by either the psychiatrist or the licensed APRN for medication renewal. Several inmates are also seen at a minimum of once a month by their case worker who could be either the psychiatric nurse or a social worker. As demonstrated by the opinions of Drs. Chaplin and Liu, and by the experience of the parties during the evaluation process that occurred prior to commencement of this suit, many of the inmates at Northern and Garner freely exercise their right to allow or not allow OPA access to their medical and mental health files. Some of the inmates have very painful and very personal memories such as being sodomized as a child. The inmates only discuss these memories after strong and frequent assurances that the information they want to uncover and work through will not be revealed to others. This is the very reason for the psychotherapist-patient privilege recognized by the United States Supreme Court in *Jaffe*. Plaintiff's motion disregards both *Jaffe* and the harm that can be done to an inmate's therapeutic relationship with

the psychologist, psychiatrist, APRN, psychiatric nurse and social workers.  For this reason alone, plaintiffs' motion should be denied.  At a minimum, the inmates should be given notice of the plaintiffs' motion and an opportunity to be heard.

### D.  Plaintiffs Proposal is Not in Compliance with HIPAA and Ignores Notions of Comity

HIPAA  contains a preemption provision, instructing that the statute and the regulations promulgated by the Secretary thereunder expressly "supercede [sic] any contrary provision of State law," 42 U.S.C. §1320d-7(a)(1) (implemented by 45 C.F.R.  § 160.203).  HIPAA's preemption over state medical privacy laws is not absolute, as  HIPAA  and its subsequent regulations do not preempt state law if the state law is "contrary" to  HIPAA  and "relates to the privacy of individually identifiable health information" such as patient medical records. Id. at 1320d-7(a)(2)(B).

Specifically, 45 C.F.R. §160.203(b) provides in relevant part:

A standard requirement, or implementation specification adopted under this subchapter that is contrary to a provision of State Law preempts the provision of State Law.  This general rule applies, except if one or more of the following conditions is met: . . .  (2)(b) the Provision of State Law relates to the privacy of individually identifiable health information and is more stringent than a standard requirement, or implementation specification adopted under subpart E of part 164 of this subchapter.

A state law is "contrary" to  HIPAA  and its regulations if a "covered entity would find it impossible to comply with both the State and federal requirements." 45 C.F.R. §160.202.  A state privacy law is "more stringent" than a  HIPAA  requirement if the state law "prohibits or restricts a use or disclosure in circumstances under which such use or disclosure otherwise would be permitted" under  HIPAA.  45 C.F.R. §160.202; *National Abortion Federation v. Ashcroft*, 2004 U.S. Dist. Lexis 4530 (S.D.N.Y. 2004).

This exception under HIPAA is in accord with federal comity principles.

Many federal courts have applied state privilege law after satisfying themselves that the state principle at issue did not conflict with, or outweighed, federal policy. *See Brem v. DeCarlo*, 162 F.R.D. 94 (D.Md. 1995)(applying Maryland medical peer review privilege in federal question action); *Komlosi v. New York State Office of Mental Retardation & Developmental Disabilities*, 1992 U.S. Dist. LEXIS 4172, 1992 WL 77544 (S.D.N.Y. 1992)(applying New York privilege law); *Doe v. St. Joseph's Hospital*, 113 F.R.D. 677, 1987 WL 15462 (N.D.Ind. 1987)(applying Indiana privilege law): *Mewborn v. Heckler*, 101 F.R.D. 691 (D.D.C. 1984)(applying District of Columbia privilege law); *Gillman v. United States*, 53 F.R.D. 316 (S.D.N.Y. 1971(applying New York privilege law). Indeed, the Second Circuit, in a brief per curiam opinion, stated that "as a matter of comity federal courts accord deference to state created privileges." *United States v. One Parcel of Property at 31-33 York St*, 930 F.2d 139, 141 (2d Cir. 1991).

The fact that the hospitals enjoy no federal evidentiary privilege shielding the subpoenaed records from discovery, however, does not mean that the parties to this case have a federally-conferred license to rummage through the hospitals' files in complete disregard of the privacy and related policy interests that have moved the legislatures of at least New York and New Jersey to shield at least some of these materials from state process. . .

*Johnson v. Nyack Hospital*, 169 F.R.D. 550, 561 (S.D.N.Y. 1996) (emphasis added).

The Connecticut courts and its legislature have recognized that "the people of this state enjoy a broad privilege in the confidentiality of their psychiatric communications and records." *State v. Rosado*, 52 Conn. App. 408, 414 (Conn.App. 1999); C.G.S. §§ 52-146d and 52-146e. Connecticut courts recognize that "the exceptions to the general rule of nondisclosure of communications between psychiatrist and patient were drafted narrowly to ensure that the confidentiality of such communications would be protected unless important countervailing considerations required their disclosure." *Falco v. Institute of Living*, 254 Conn. 321, 328 (2000)(citations omitted). Indeed, under Connecticut law, the courts "have long held that ... exceptions to statutes are to be strictly construed with doubts resolved in favor of the general rule rather than the exception....  [W]here express exceptions are made, the legal presumption is that the legislature did not intend to save other cases from the operation of the statute." *Id*. at 330 (citations omitted).  Under Connecticut law, plaintiff's medical files and mental health files

cannot be disclosed without a release, unless certain limited exceptions which are not applicable here, apply.  Connecticut General Statute §52-146o §52-146e.   In addition, there are strict limitations under Connecticut General Statutes § 19a-583 for the disclosure of HIV information.  None of the listed exceptions authorizing disclosure of HIV information apply here.

Thus,  45 C.F.R. §160.203(b) and comity principles combine to establish that, in this case, plaintiffs, their attorneys and their experts should not be allowed to rummage through the medical and mental health files of all inmates at NCI and Garner.

Plaintiffs cite to *Northwestern Memorial Hospital v. Ashcraft*, 362 F.3d 923, 926 (7th Cir. 2004).   There, the Seventh Circuit Court of Appeals found that the Illinois State Statutory Confidentiality Provisions did not apply under 45 CFR §160.203(b) but affirmed the district court's order quashing the subpoena.  In quashing the subpoena, which sought *redacted* medical records, the Seventh Circuit stated:

> Like the district judge, we think the balance weighs in favor of quashing the subpoena…. <u>Even if there were no possibility that a patient's identity might be learned from a redacted medical record, there would be an invasion of privacy</u>…. <u>If Northwestern Memorial Hospital cannot shield its abortion patients' records from disclosure in judicial proceedings, moreover, the hospital will lose the confidence of its patients</u>….  the only issue for us is whether, given that there is a potential psychological cost to the hospital's patients, and a potential cost in lost goodwill to the hospital itself from the involuntary production of the medical records even as redacted, the cost is offset by the probative value of the records…. Of course, not having seen the records the government labors under a disadvantage, although it has surely seen other medical records.  And of course, pretrial discovery is a fishing expedition and one can't know what one has caught until one fishes.  But Fed. R. Civ. P. 45(c) allows the fish to object, and when they do so the fisherman has to come up with more than the government has been able to do in this case despite the excellence of its lawyers…. <u>the fact that quashing the subpoena comports with Illinois medical records privilege is a final factor in favor of the district court's order</u>….   comity <u>"impels federal courts to recognize state privileges where this can be accomplished at not substantial cost to federal substantive and procedural policy….  in a case such as this in which, so far as we can determine, applying the privilege would not interfere significantly with federal proceedings, comity has required us, not to apply the Illinois privilege, but</u>

<u>to consider with special care the arguments for quashing the subpoena on the
basis of relative hardship under Fed. R. Civ. P. 45(c).</u>

*Northwestern Memorial Hospital v. Ashcroft*, 362 F.3d at 928, 929, 930, 931 and 932 (emphasis
added).

  Plaintiffs also rely upon the *Ashcroft* New York district court decision in arguing that
Connecticut's statutes regarding medical and psychiatric confidentiality are of no concern to this
court.   The district judge held that a New York confidentiality statute did not bar the
defendants' subpoena to a New York hospital.   However, it is most significant that, in ordering
the production of medical records, the court fashioned a protective order which called for the
redaction of:

> The patient's name, the name of any spouse, partner, child and emergency contact
> (collectively 'patient relatives'); the birth date, social security number, address,
> telephone number, fax number and email address of the patient and patient
> relative; the patient and any patient's relative's insurance policy number or group
> number, and any medical record or chart number.

*Id.*, 2004 U.S. Dist. Lexis at 22; *See also Lora v. Board of Education*, 74 F.R.D. 565 (E.D.N.Y.
1977)(Calling for redaction of personally identifying information in the production of fifty
randomly selected diagnostic and referral files).

  Similarly, in *N.O. v. Callahan*, 110 F.R.D.637, 641(D. Mass 1986), current or former
inpatients at mental health facilities filed an action challenging the adequacy of medical care.
Plaintiffs sought to represent a class of other persons who are or may be inpatients at the
facilities operated by Massachusetts Department of Mental Health.  Plaintiffs sought to videotape
non-party patients.  The court found that defendant's objection to the videotaping and
photographing of non-party patients, who had not given their consent, had merit.  The court
ruled: "The parties should obtain written consent of the patient in advance of filming; should
explain to the patients the purpose of filming and the extent of release of any films; and should

ascertain, where possible, if the patient has been adjudicated incompetent." *Id.* The court did

allow plaintiffs access to medical records of the non-party patients, but all references to the

patients' identity first had to be redacted. In addition, as *Jaffe* was not decided until 1996, there

was no federal common law psychotherapist-patient privilege at the time the court ordered

access to the medical records of non-party patients.

In *Doe v. Meachum*, upon which plaintiffs also rely, the court ordered disclosure of HIV

information about non-representative class members. In doing so, the court reasoned that

disclosure was not inconsistent with the state privacy statutes because by maintaining the action,

class members had put their medical condition in issue:[10]

> This conclusion is not inconsistent with the applicable Connecticut statutes,
> however. Conn. Gen. Stat. §52-146c(c) provides that communications between a
> psychologist and patient are privileged unless 'in a civil proceeding, a person
> introduces the person's psychological condition as an element of his claim. . . . In
> one of the largest class actions ever pending in this circuit, Judge Pratt rejected
> one plaintiff's claim of privilege against disclosure of his medical records.
> "Plaintiff is deemed to have waived any privilege that he may have had when he
> put his medical condition into issue by initiating this lawsuit." *In re Agent
> Orange Product Liability Litigation*, 91 F.R.D. 616, 618 (E.D.N.Y. 1981). There
> can be little doubt that the psychological and mental condition of HIV-infected
> inmates is an element, if not a large element of this class action.

*Doe v. Meachum*, 126 F.R.D at 450.

Finally, plaintiffs rely upon *A Helping Hand, LLC v. Baltimore, Maryland*, 295 F. Supp.

585 (D.Md. 2003). Rather than support their position, that case further establishes that plaintiffs

should not be given access to inmates' medical and mental health records in this case unless they

obtain written consent. There, a corporation sued the town alleging that the county administered

its zoning laws in a discriminatory fashion in violation of the ADA. The county sought access to

---

[10]   The class was defined as  namely all persons who  were at any time since August 15, 1985,
are or will be subject to the care and custody of defendant *Meachum*, excluding the class

the corporation's patient records.  The court denied the county access to such records, noting that the information sought was "extremely sensitive".

This court should accord comity to the State's confidentiality laws and hold that plaintiffs, their experts and attorneys cannot rummage through the most intimate and perhaps only confidential aspect of an individual's prison confinement, particularly in light of the fact the plaintiffs can obtain a release from the inmates for a review of their most private material, their medical, mental health and HIV information.   Indeed, as shown above, prior to initiating this action, plaintiffs sent a notice out to the inmate population at Northern asking if they wanted OPA and OPA's expert to review their files.  Many inmates consented, many refused.  To now allow plaintiffs, their experts and their attorneys to review every single medical and mental health file of every inmate at Northern and Garner does a substantial disservice to the inmate population and those who are trying to treat them behind bars.   If inmates know that anyone can gain access to their medical files by seeking such an order from a district court, without their knowledge,  many will no longer disclose painful, personal memories with their mental health social worker, nurse, psychologist and psychiatrist.  Many may also no longer openly share with medical providers symptoms of HIV or other communicable diseases.  Like the Seventh Circuit found in the *Northwestern* case, by allowing unfettered access to *non-redacted* health records, without the inmate's knowledge or consent, this court and plaintiffs would take away any sense of confidentiality an inmate has, and any incentive an inmate has to seek treatment for mental illness, HIV and a host of other conditions.

The harm that will be caused by the plaintiffs' motion will be substantial.  The plaintiffs' can lessen the impact of their actions, and obtain the information they require without harming

---

certified in *Smith v. Meachum*, Civ. No. H87-221(JAC). *Doe v. Meachum,* 126 F.R.D. 442, 444

ongoing therapeutic relationships by allowing the inmates themselves to authorize the release of information to plaintiff's consultants.  This court should recognize the state statutes, which are founded upon the significant interests for maintaining medical and mental health treatment information confidential.  Proper accord for these state statutory interests is a further ground for denying the plaintiffs' motion.

### E.     The Inmates At Northern Have a Right to Be Heard on Whether Plaintiffs Should Access Their Medical Records

At a minimum, the inmates at Northern should be advised of the pendency of plaintiff's motion and given an opportunity to be heard on this issue.

> It is an aspect of the broader " right to be let alone " that one of our wisest Justices characterized as "the most comprehensive of rights and the right most valued by civilized men."  *Olmstead v. United States*, 277 U.S. 438, 478, 72 L. Ed. 944, 48 S. Ct. 564 (1928) ( Brandeis, J., dissenting).

*Hill v. Colorado*, 530 U.S. 703, 717, 120 S. Ct. 2480, 2490, 147 L. Ed. 2d 597, (2000)

The Third Circuit held that the National Institute for Occupational Safety and Health needed to notify employees that it was seeking to examine the employees' medical files and allow them to raise a claim of personal privacy if they desired.  *United States v. Westinghouse Electric Corporation*, 638 F.2d 570, (3rd Cir. 1980).

> Although Westinghouse has been permitted to assert the general claim of privacy on behalf of all of the employees, and has done so vigorously on the employees' behalf, each employee is entitled to make an individual judgment as to whether s/he regards the information so sensitive that it outweighs that employee's interest in assisting NIOSH in a health hazard investigation that may benefit the employee.  We do not think it appropriate to permit Westinghouse to assert the claims of individual employees to privacy in particular documents.  Each employee is uniquely capable of evaluating the degree of confidentiality which s/he attaches to discrete items of information in his or her file. . . .*Under the circumstances, we believe the most appropriate procedure is to require NIOSH to give prior notice to the employees whose medical records it seeks to examine and*

(D.Conn.1989).

> *to permit the employees to raise a personal claim of privacy, if they desire*. The form of notice may vary in each case but it should contain information as to the fact and purpose of the investigation and the documents NIOSH seeks to examine, and should advise the employees that if they do not object in writing by a date certain, specifying the type of material they seek to protect, their consent to disclosure will be assumed. The mechanics of the required notice can be arranged by the district court in accordance with the circumstances of the particular case. . . .The touchstone should be provision for reasonable notice to as many affected individuals as can reasonably be reached; an opportunity for them to raise their objections, if any, expeditiously and inexpensively; preservation of confidentiality as to the objections and the material itself from unwarranted disclosure; and prompt disposition to that NIOSH's evaluation is not hampered.

*United States v. Westinghouse*, 638 F.2d at 581, 582 (emphasis added).

The cases cited by plaintiffs are not dispositive of this issue.   In *Law v. Zuckerman*, 307 F. Supp. 2d 705 (S.D. Md 2004), and *Hutton v Martinez*, 219 F.R.D. 164 (N.D. Ca. 2003), at issue was  access to the medical files of one of the actual parties to the litigation.   Thus, the parties to that litigation had an actual opportunity, through counsel, to advance their arguments for and against disclosure.   In addition, neither party advanced their constitutional right to privacy or their federal common law psychotherapist-patient privilege.

Here, the individual inmates whose medical and mental health records have the right to be notified about this procedure and to heard on the issue.  Just as significant, the enabling legislation of OPA requires such consent, and therefore the procedure proposed by plaintiffs in this case is, at least, *ultra vires*.  It is important to note that OPA has proposed sending a letter advising the inmates at Northern about many of the other ramifications of the settlement but have refused to mention that they will be seeking a court order for access to their medical records by DMHAS staff and OPA's mental health consultant despite the requests of defendants' counsel to do so.  See  Letter To Inmates, Ex. A; Exchange of Email Messages Between Attorneys Solnit and O'Neill, Ex. B.  The inmates at Northern have a right to be fully informed that OPA is seeking access to their medical and mental health files without their consent and have a right to

be heard on the issue before this honorable court.  At a minimum, the inmates should be given

notice of plaintiffs' motion and, if necessary, counsel should be appointed to represent the

interests of the inmates at Northern and Garner on this issue.

### IV.  <u>CONCLUSION</u>

For the foregoing reasons, the plaintiffs' motion for disclosure of records should be

denied.  Alternatively, the plaintiffs' motion should be denied without prejudice until the inmates

that are directly affected by this motion are given notice thereof and an opportunity to file an

appropriate objection thereto, if necessary, through appointed counsel.


DEFENDANTS
Wayne Choinski, et al.


RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:     <u>   /s/                            </u>
Terrence M. O'Neill
Ann E. Lynch
Steven R. Strom
Assistant Attorneys General
Federal Bar No. 10835
110 Sherman Street
Hartford, CT  06105
Tel: (860) 808-5450
Fax: (860) 808-5591
Email: terrence.oneill@po.state.ct.us

## <u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing  was mailed in accordance with Rule 5(b) of

the Federal Rules of Civil Procedure on this 30th of June, 2004,  first class postage prepaid to:

Ben A. Solnit, Esq.
Tyler Cooper & Alcorn, LLP
205 Church Street
P.O. Box 1936
New Haven, CT  06509-1910

Nancy B. Alisberg, Esq.
Office of Protection & Advocacy
60-B Weston Street
Hartford, CT  06120

David C. Fathi, Esq.
ACLU National Prison Project
733 15th Street, NW, Suite 620
Washington, D.C.  20005

Annette Lamoreaux, Esq.
Connecticut Civil Liberties Union Foundation
32 Grand Street
Hartford, CT  06106


_____/s/_____
Terrence M. O'Neill
Assistant Attorney General