# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| STATE OF CONNECTICUT OFFICE OF : <br> PROTECTION AND ADVOCACY : <br> FOR PERSONS WITH DISABILITIES; : <br> JAMES MCGAUGHEY, Executive : <br> Director, Office of Protection and : <br> Advocacy for Persons with Disabilities, : <br> : <br> Plaintiffs, : <br> : <br> v. : <br> : <br> WAYNE CHOINSKI, Warden, : <br> Northern Correctional Institution, : <br> in his official capacity; : <br> GIOVANNY GOMEZ, Warden, : <br> Garner Correctional Institution, : <br> in his official capacity; and : <br> THERESA C. LANTZ, Commissioner, : <br> Connecticut Department of Correction, : <br> in her official capacity; : <br> : <br> Defendants. : | Civil Action No. 3:03CV1352 (RNC) <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> July 25, 2004 |

### DECLARATION OF TERRY A. KUPERS, M.D., M.S.P.

I, Terry A. Kupers, declare:

1.      I received a B.A. Degree in Psychology from Stanford University in 1964. I subsequently earned an M.D. from the UCLA School of Medicine in 1968 and a Master's Degree in Social Psychiatry from UCLA in 1974. I completed residency training in Psychiatry at UCLA and became Board Certified in Psychiatry in 1974.

2.      I have a private psychiatry practice in Oakland, California. I am an Institute Professor at Wright Institute in Berkeley, California, and a Distinguished Fellow of The American Psychiatric Association. I am the author of four books, including Prison Madness: The Mental Health Crisis Behind Bars And What We Must Do About It (Wiley, 1999).

3. I was employed by the plaintiffs in this matter to conduct a tour of Northern Correctional Institution and Garner Correctional Institution and to write a report about conditions and mental health services in the two institutions for prisoners with mental illness. Once this lawsuit was brought, I continued to advise the plaintiffs on issues regarding conditions of confinement and treatment of prisoners with mental illness at Northern and Garner.

4. I have reviewed the June 29, 2004 affidavit of Martin Paul Chaplin, Ph.D and the June 25, 2004 affidavit of Man Liu, Ph.D in this matter.

5. Both affidavits raise concerns regarding the review of prisoner medical records at Northern and Garner by plaintiffs and their consultants in connection with monitoring compliance with the settlement agreement reached in this matter.

6. In my experience, both agencies and consultants routinely conduct reviews of prisoner medical records without receiving prior consent from the prisoners and without producing any ill effects on the prisoners.

7. For example, such accrediting agents as the National Commission on Correctional Health Care ("NCCHC") and Joint Commission on The Accreditation of Healthcare Organizations ("JCAHO") include the review of medical records in their standard accreditation procedure without giving notice to or obtaining consent from the individuals whose records are reviewed. I attach a copy of a description of the NCCHC accreditation procedure, which notes at pages 255 (second to last line) and 258 (first line) that prisoner medical records will be reviewed during that process.

8. Similarly, I have toured prisons and jails to evaluate mental health services and have reviewed prisoner health records upon signing a statement that I would protect the privacy and confidentiality of those records but without receiving prior consent from individual prisoners. Such a procedure is standard and could easily be put in place here.

9. I have been involved in reviewing mental health care in jails and prisons for over 25 years and these procedures have been successful. I have never found that my review caused any anti-therapeutic effects on the prisoners whose records I reviewed. Indeed, most prisoners welcome review by outside professionals or agencies of the quality of healthcare provided to them. The concerns raised by Dr. Chaplin and Dr. Liu, while theoretically possible, are thus refuted by experience.

10. On the other hand, allowing prisoners to opt out of the review process by requiring their individual consent runs the risk that the records of the sickest prisoners will not be reviewed. This danger outweighs any theoretical anti-therapeutic effect of allowing the consultants to review prison records without prior individual consent.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 25, 2004.

*Terry A. Kupers*

Terry A. Kupers, M.D., M.S.P.

3

# STANDARDS FOR HEALTH SERVICES

# IN JAILS

## 2003

These standards represent the official position of the National Commission on Correctional Health Care with respect to minimum requirements for health services in jails. They do not necessarily represent the official position of supporting organizations or individuals represented on the National Commission on Correctional Health Care Board of Directors.

© 2003 National Commission on Correctional Health Care

# STEPS TO BECOMING NCCHC ACCREDITED

## Application

1. A completed accreditation application, available at www.ncchc.org or by calling the NCCHC office, signed by the person legally responsible for the facility (not the responsible health authority), should be submitted with the application fee. This application serves as the contract between the facility and NCCHC.

2. NCCHC will forward the Self-Survey Questionnaire (SSQ). Telephone technical assistance will be available to help with the SSQ and throughout the accreditation process.

## Pre-survey Activity

1. The completed SSQ should be returned to the National Commission for review.

2. Once returned, and depending on the review of the SSQ responses and how well prepared the applicant appears, an on-site survey will be scheduled for approximately 3 to 6 months from date of receipt. You will be contacted and a date will be agreed upon for the survey.

3. An NCCHC surveyor will contact you ahead of time; and you will be asked to forward a copy of your policy and procedure manual.

4. Site surveys are completed in time for review at meetings of the NCCHC Accreditation Committee (meetings are held at the end of February, June, and October).

## Survey Parameters

1. The survey should be viewed as a professional learning experience for your staff. NCCHC strives to make the process as helpful as possible. Surveyors try not to minimize the disruption to the regular daily activities within the facility.

2. The length of the survey and number of surveyors will be shared with you ahead of time. Most surveys are completed in two to three days, with the number of surveyors varying depending on the size and complexity of the facility. At least one physician is always a member of the survey team.

3. The survey typically involves an entrance and exit conference; tours of the facility including housing areas; interviews of correctional and health staff as well as inmates and patients; medical records reviews; and review of other documentation necessary for determining compliance with the standards.

**Correctional Staff Involvement**

1. You will receive the names of the surveyors ahead of time. Please arrange for the necessary clearance and authorization for them to enter the facility. If additional information is required, please request it ahead of time so we can provide it to you.

2. Notify the person legally responsible and senior administrators of the NCCHC surveyors' upcoming visit and arrange for personal interviews.

3. Inform custody personnel that the surveyors will choose a sample of inmates from the current inmate roster and have the roster available. Some correctional officers will also need to be interviewed. Please arrange for a private interview room.

4. Advise security personnel that the surveyors will need to tour the facility at some point during the survey, and arrange for an escort.

**Medical Staff Involvement**

1. Please arrange for a room (with a telephone, if possible) for the surveyors' use as an office throughout the survey.

2. Arrange for the chief health administrator to schedule time for an extensive interview.

3. Arrange for all applicable individuals listed below to be available for private interviews. The surveyors will work out the exact schedule when they arrive. Please arrange for a suitable interview room(s).

    responsible physician         psychiatrist
    dentist                       psychologist
    food service director         staff responsible for CQI
    other medical staff           other health care personnel
    pharmacist or person responsible for pharmacy operations

4. Have your policy and procedures manual readily available.

5. Review the standards. Have documentation relative to the standards readily available. Facilities often provide a binder or folders of documentation which supports each NCCHC standard., although this is not necessary as long as the material is readily available.

6. Have the following documentation assembled and available for review (for a first-time accreditation survey we are looking for documentation of one year's compliance with the standards; for re-accreditation we are looking for documentation of continual compliance since the last on-site survey.)
    - Minutes of meetings between the health authority and facility administrator
    - Documentation of monthly health staff meetings

- Statistical reports
- Policy manuals for on-site special services (if any), e.g., laboratory, radiology, physical therapy
- Documentation of physician chart reviews
- Minutes of quality assurance committee meetings, if applicable
- Documentation of external peer review (if any) in the form of letters or reports
- The facility's emergency plan and critiques of disaster drills
- Monthly sanitation reports or checklists
- Copies of credentials for all health staff (medical, dental and mental health) employed full- or part-time
- The plan or curriculum for orientation of new health staff
- In-service training plan, schedule, and curricula for health staff
- Documentation of in-service training for each full-time health professional.
- Documentation indicating the number of correctional staff who have had (a) first-aid training, (b) CPR training, and (c) other health-related training
- List of health professionals who are CPR-trained
- Inventory sheets, logs, or records for (a) syringes and needles; (b) sharp instruments; and (c) controlled drugs
- Copies of written agreements with all hospitals that provide services to inmates
- The formulary used by the facility
- A copy of the inmate handbook (if any) or other written material given to inmates regarding access to health services
- A mock (blank) medical record containing copies of all forms used, filed in the order in which they appear in patients' charts
- Blank copies of any other health service forms used (except fiscal) that are not filed in the patients' charts
- Sick-call logs or appointment lists for a two-week period for medical, dental and mental health services
- Copies of any standing orders or treatment protocols used
- Meeting minutes (if there is an infection control committee) and other existing documentation of infection control practices
- Examples of pamphlets, books, other materials, and lists of video tapes (if any) used in the inmate health education program
- A list of the names and phone numbers of people, hospitals, ambulances, etc., to be called in an emergency
- A list of dental treatment priorities
- Documentation that the dietitian has reviewed menus and medical diets on at least a semi-annual basis
- Sample logs, cell cards, or other evidence that health staff check individuals in segregation
- If there is an infirmary, a description of the scope of services provided
- If there is an infirmary, a manual of nursing procedures
- The facility's plan and policies addressing suicide prevention
- A list of any deaths at the facility together with mortality reviews and death records
- Quarterly pharmacy inspections, if required

257

- The surveyors will select individual medical records for review.

7. A one-hour exit conference will be planned for the end of the survey. This conference is intended to provide you with preliminary feedback regarding the survey and to answer any questions you may have.

## Post-survey Activities

1. In most cases you will receive a telephone call or facsimile in approximately three weeks of the survey advising you of preliminary survey results.

2. Although not required, you may provide documentation of corrective action prior to the Accreditation Committee meeting. Revised reports will reflect this post-survey documentation.

## Accreditation Committee

1. The data collected during the site survey are correlated, analyzed, and presented to the Accreditation Committee for review and decision.

2. The Committee may:
   a. Award accreditation;
   b. Award accreditation upon verification (AV) (for initial accreditation) or continuing accreditation with verification (CAV) for re-surveys, which are contingent upon receipt and verification of relevant data (usually some missing information from the survey, or documentation of corrective action);
   c. Defer the decision on accreditation (for initial accreditation) until the next review period (usually on the basis of deficiencies and/or missing data), providing additional time for documentation of corrective action; or, in the case of accredited facilities, place the facility on Probation until the next review period (usually on the basis of deficiencies and/or missing data), providing time for documentation of corrective action; or
   d. Deny accreditation (for initial accreditation) or withdraw accreditation (for continuing accreditation).

3. Within approximately 2 weeks of the committee meeting, the facility will receive official notice of the Accreditation Committee's decision. If you have not received notice of the decision within thirty days of the meeting date, please contact the NCCHC directly.

## Notification of Accreditation Committee Decision

1. The Commission will send the letter with the accreditation decision and the report of the survey to the person legally responsible (who signed the application, or his successor) and the health services administrator. In facilities with contracted health services, the designated contractor representative also receives a copy upon request.

2. If you are accredited, a framed certificate of accreditation is forwarded under separate cover. Framed certificates are issued in years of the on-site visit; letters confirming continued accreditation are issued in the years between surveys.

**Survey Cycle**

1. The usual on-site survey cycle is every three years.

2. The Accreditation Committee may schedule focused surveys or re-surveys more frequently, at its discretion.

3. All facilities, including those scheduled for re-survey, are required to return an Annual Maintenance Report (AMR) confirming continuing compliance with the *Standards*.

**Accreditation Fees**

1. Accreditation fees are based on sliding scales depending on the type of facility (prison, jail or juvenile facility), average daily population (ADP), presence of satellites and distance from main facility of each, and complexity of programs offered.

2. There is an initial accreditation fee and annual fees thereafter. Invoices are sent out early in each calendar year.

**Additional Information**

Additional background and details on the accreditation process are available on the NCCHC Web site (www.ncchc.org), or by calling the accreditation department.
Accreditation staff are available without charge on an ongoing basis to accredited facilities to assist in questions of compliance or other health related questions. More extensive technical assistance is also available.

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

United States District Court
District of Connecticut
FILED AT HARTFORD
6/1                    , 198
Kevin F. Rowe, Clerk
By _____
Deputy Clerk

VALERIE WEST, et al.

        Plaintiffs

    v.

JOHN R. MANSON, et al.

        Defendants

CIVIL NO. H83-366 (AHN)
                          (FOE)

APRIL 23, 1987

## CONSENT JUDGMENT

TABLE OF CONTENTS

|     |     | PAGE |
| --- | --- | ---: |
| I. | DEFINITIONS | 1 |
| II. | ADMINISTRATION, PRESCRIPTION AND MONITORING OF PSYCHOTROPIC MEDICATION | 2 |
| III. | SECLUSION AND RESTRAINT OF MHU INMATES | 12 |
| IV. | ADMINISTRATIVE DETENTION, ADMINISTRATIVE SEGREGATION, AND RESTRAINT OF GENERAL POPULATION INMATES | 21 |
| V. | RECREATION | 22 |
| VI. | STAFFING | 23 |
| VII. | DOCUMENTATION | 26 |
| VIII. | NORWICH OR OTHER CONNECTICUT STATE MENTAL HEALTH FACILITY | 30 |
| IX. | AGREEMENT MONITORING PANEL | 32 |
| X. | MISCELLANEOUS | 34 |
| XI. | GENERAL PROVISIONS | 35 |

5. If there are no bed spaces at NH, or NH refuses admission, and transfer is appropriate, MHU staff shall request that an inmate be placed on an appropriate waiting list for a DMH facility or initiate probate court proceedings.

IX. AGREEMENT MONITORING PANEL

1. An independent Agreement Monitoring Panel ("AMP") shall be established to monitor the provisions of this Consent Judgment.

2. The AMP shall consist of persons with appropriate knowledge and expertise in mental health care and services. It shall be formed within three weeks of the signing of this Judgment and consist initially of three persons: one as chosen by defendants, one as chosen by plaintiffs, and one as chosen by a consensus of those persons already selected. No one who is on the staff at CCIN shall be a member of AMP. DMR and DMH respresentatives shall be considered for selection to AMP. Should one or more of the originally designated members of AMP be unable to serve the full duration of the AMP, replacements shall be made as mutually agreed upon by the parties. In the event of a disagreement between the parties, the Court shall appoint the replacement(s). The defendants shall contract with each expert on the AMP for the consultative services required by this Consent Judgment. Defendants also agree to represent and to hold harmless to the same extent as state employees the members of the AMP in any litigation involving the AMP in its performance of its duties under this Consent Judgment.

3. The AMP shall devise procedures for the monitoring of this Consent Judgment which shall include on-site inspections of MHU operations. These procedures may be modified by the AMP as it deems necessary. The AMP shall provide the Warden of CCIN and counsel for the parties with quarterly reports during the first year of this Judgment and semi-annual reports thereafter.

4. In monitoring this Judgment, the AMP shall focus on patterns of compliance and noncompliance, as well as on individual cases of substantial deviation from the standard of care provided herein. Panel members shall apply standards of what is professionally acceptable mental health care in evaluating care at CCIN and performing their monitoring function.

5. Upon due notice the AMP shall have access to all policies, records, procedures and files at CCIN relevant to mental health treatment, as well as access to all staff and consulting physicians with respect to mental health treatment.

6. This Consent Judgment may be modified by the mutual agreement of all parties. The AMP may not, without the express consent of all parties to the Consent Judgment, alter, amend or change the provisions of the Consent Judgment. The court shall be notified in writing of all such modifications, but need not approve such modifications.

7. In the event a dispute should arise concerning compliance with this Judgment which cannot be amicably resolved between the

- 41 -

Respectfully Submitted,

BY: *Martha Stone*
Martha Stone
Nancy Hronek
Connecticut Civil Liberties
    Union Foundation
32 Grand Street
Hartford, CT    06106


BY: *Shelley Geballe*
Shelley Geballe
Connecticut Civil Liberties
    Union Foundation
32 Grand Street
Hartford, CT    06106

Attorneys for Inmate
    Plaintiffs


Joseph I. Lieberman
Attorney General


BY: *Stephen O'Neill*
Stephen O'Neill
Assistant Attorney Generals
340 Capitol Avenue
Hartford, CT    06106


BY: *Steven Strom*
Steven Strom
Assistant Attorney Generals
340 Capitol Avenue
Hartford, CT    06106
Attorneys for Defendants


So approved: 6/1/87
*[signature]*
UNITED STATES DISTRICT JUDGE