UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE OF CONNECTICUT OFFICE OF | : | Civil Action No.  3:03CV1352 (RNC) |
| PROTECTION AND ADVOCACY | : | |
| FOR PERSONS WITH DISABILITIES; | : | |
| JAMES MCGAUGHEY, Executive | : | |
| Director, Office of Protection and | : | |
| Advocacy for Persons with Disabilities, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| WAYNE CHOINSKI, Warden, | : | |
| Northern Correctional Institution, | : | |
| in his official capacity; | : | |
| GIOVANNY GOMEZ, Warden, | : | |
| Garner Correctional Institution, | : | |
| in his official capacity; and | : | |
| THERESA C. LANTZ, Commissioner, | : | |
| Connecticut Department of Correction, | : | |
| in her official capacity; | : | |
| | : | |
| Defendants. | : | October 11, 2005 |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR REASONABLE ATTORNEY FEES AND COSTS

### FACTS AND PROCEDURAL HISTORY

Plaintiff Office of Protection and Advocacy for Persons with Disabilities (OPA) is

an agency charged by state and federal law with protecting the rights of persons with

disabilities, including those confined in institutions such as prisons and jails.  Plaintiff

James McGaughey is OPA's Executive Director.  On August 6, 2003, plaintiffs OPA and

McGaughey (hereinafter "plaintiffs") filed this action pursuant to 42 U.S.C. § 1983,

alleging that the conditions under which persons with mental illness were confined at

**ORAL ARGUMENT NOT REQUESTED**

Northern Correctional Institution (NCI) and Garner Correctional Institution (GCI) constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. In particular, plaintiffs alleged that conditions of social isolation and sensory deprivation at NCI caused persons with mental illness to deteriorate to the point of mental breakdown, self-harm, and attempted suicide. Named as defendants in their official capacities were Theresa C. Lantz, Commissioner of the Connecticut Department of Correction (DOC); Wayne Choinski, Warden of NCI; and Giovanny Gomez, Warden of GCI. The suit sought only injunctive and declaratory relief; no damages were sought. See generally Complaint, August 6, 2003.

Negotiations commenced immediately, and on March 8, 2004, the parties executed a comprehensive Settlement Agreement (hereinafter "SA"), a copy of which is appended to this Memorandum. The SA provides for the permanent removal of all prisoners with serious mental illness from NCI. See SA at 6-8. To identify prisoners with serious mental illness, the SA provides that certain groups of NCI prisoners shall be evaluated by clinicians from the Connecticut Department of Mental Health and Addiction Services (DMHAS), and that the reports generated by these evaluations "will be provided to the parties as they are generated." SA, Appendix B.

In addition, the SA provides for myriad changes in the treatment of persons with mental illness who are confined at NCI and GCI. Areas governed by the SA include:

Mental health staffing (SA at 8)
Psychoactive medication (id. at 9)
Confidentiality of mental health services (id. at 10)
Use of force on the mentally ill (id. at 11)
Discipline (id.)
Observation for mental health purposes (id. at 12)
Use of restraints (id.)
Programming (id. at 13)

2

Out-of-cell exercise (id. at 14)
Mail, visiting, and telephone use (id. at 15)
Staff training (id.)
Miscellaneous conditions at GCI (id. at 15-16)

Finally, the SA settled plaintiffs' claims for attorney fees and costs "incurred in this case to date." SA at 19, § B.18.

The SA provided by its terms that it would not become effective until the Court entered an order of dismissal that incorporated the terms of the SA. SA at 2, §§ A.6, A.7. Moreover, the SA contemplated several additional steps before it became effective. First, the SA was to be submitted to the General Assembly for approval pursuant to Conn. Gen. Stat. § 3-125a. SA at 19. This was accomplished on April 30, 2004.

Most importantly, the SA contemplates that defendants' compliance will be audited by mental health and custody consultants chosen by the parties. Plaintiffs and defendants were each required to select one custody consultant and one mental health consultant; the two custody consultants would then develop the audit instrument for custody issues, and the two mental health consultants would develop the audit instrument for mental health issues. SA at 17-18. The SA requires that, "[p]rior to the effective date of this agreement," the consultants shall meet and develop an audit instrument for the purpose of evaluating defendants' compliance with the SA. Id. at 18. Unfortunately, this process was substantially prolonged by defendants.

For example, plaintiffs sent defendants a draft of the custody audit on August 9, 2004; defendants did not respond until six weeks later, on September 23. Moreover, while defendants had in the interim assured plaintiffs that the parties' remaining differences were minor, their September 23 response made clear that major differences remained. See Fathi dec., Exh. 3.

3

Defendants' delay was even greater, however, with regard to the mental health audit instrument. Plaintiffs nominated Carl Fulwiler, M.D., Ph.D., as their mental health consultant; defendants named Suzanne Ducate, M.D. The two psychiatrists promptly began work, but the process soon broke down due to Dr. Ducate's failure to respond to communications from Dr. Fulwiler. On July 30, 2004, Drs. Fulwiler and Ducate met, with the parties' counsel present, and appeared to resolve several issues with regard to the audit instrument. Dr. Ducate agreed to produce a draft reflecting this agreement, but did not do so until two months later, on September 29. When she did, her draft bore very little resemblance to the terms agreed to by the parties on July 30. See Fathi dec., Exh. 4. A week later, on October 8, 2004, Dr. Ducate resigned, and the process ground to a halt. See id., Exh. 5. Defendants took more than three and a half months – until January 24, 2005 – to retain a new mental health consultant; it was only then that the process resumed. See Fathi dec., Exh. 6.[1]

Defendants also failed to provide plaintiffs documents required by the SA. As already noted, the SA plainly states that the reports generated by DMHAS evaluations of prisoners at NCI "will be provided to the parties as they are generated." SA, App. B. Nevertheless, when plaintiffs requested these reports, defendants refused to provide them. See Fathi dec., Exh. 8. Defendants' counsel did state, however, "I think what I will do is release the evaluations with the identifying information of the individual inmates redacted." Id. When plaintiffs then requested these redacted documents, defendants

---

[1] Between March 2004 and August 2005, Dr. Fulwiler billed plaintiffs $17,100. See Fathi dec., Exh. 7. These expert fees are not recoverable under § 1988. West Virginia Univ. Hosp., Inc. v. Casey, 499 U.S. 83, 102 (1991).

shifted position yet again, and refused to provide the evaluations at all. See Fathi dec.,
Exh. 9.

Even after the parties had agreed to a joint motion to dismiss the case, defendants
prolonged the process. On September 13, 2005, one of defendants' counsel asked
plaintiffs' counsel to forward the agreed motion to dismiss for signature and filing. See
Fathi dec., Exh. 10. However, the following day, another of defendants' counsel
vehemently objected to the motion that had already been agreed to by his colleague. See
id., Exh. 11. This resulted in further delay in filing the motion to dismiss.

Seven months elapsed between the filing of this lawsuit on August 6, 2003 and
the signing of the SA on March 8, 2004. However, because of the events set forth above,
it took more than eighteen months to finalize the SA and file the joint motion to dismiss.
This Court approved the SA and dismissed the case on September 26, 2005, retaining
jurisdiction to enforce the SA. Plaintiffs now seek their reasonable attorney fees and
costs incurred from March 9, 2004 through September 25, 2005.[2]

## ARGUMENT

**I.      Plaintiffs are prevailing parties entitled to an award of attorney fees.**

The Civil Rights Attorney Fee Award Act, 42 U.S.C. § 1988, provides:

**(b) Attorney's fees**

---

[2] Because the parties were unable to agree on disclosure of prisoner health records to the
consultants who would monitor compliance with the SA, the SA provided that this issue
would be submitted to the Court. SA at 17. Accordingly, the parties briefed this issue,
and this Court held three telephonic hearings on the matter. The Court ultimately asked
the parties to meet with Magistrate Judge Martinez to attempt to negotiate a resolution of
this issue. With her valuable assistance, the parties were ultimately able to reach
agreement on an amendment to the SA, which was filed with the Court on September 21,
2005.

> In any action or proceeding to enforce a provision of section[] ... 1983 ... of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs[.]

42 U.S.C. § 1988(b). Under this statute, plaintiffs are considered prevailing parties "if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." Id. at 435.[3]

"For a plaintiff to be considered a 'prevailing party,' and thus eligible for an award of fees, he need not have succeeded on 'the central issue' in the case, Texas State Teachers Association v. Garland Independent School District, 489 U.S. 782, 790-91 (1989), and need not have 'obtain[ed] the primary relief sought,' Carroll v. Blinken, 42 F.3d 122, 130 (2d Cir. 1994)." LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 757 (2d Cir. 1998). "A party need not succeed on every issue raised by him, nor even the most crucial one." LaRouche v. Kezer, 20 F.3d 68, 71 (2d Cir. 1994). Rather, "[i]t is sufficient that the plaintiff succeeded on 'any significant issue in [the] litigation,' Texas State Teachers Association v. Garland Independent School District, 489 U.S. at 791 (internal quotation marks omitted), regardless of 'the magnitude of the relief obtained,' Farrar v. Hobby, 506 U.S. 103, 114 (1992), if he received 'actual relief on the merits of his claim [that] materially alters the legal relationship between the parties by modifying the defendant's

---

[3] Plaintiffs do not seek an enhanced award in this case.

6

behavior in a way that directly benefits the plaintiff,' id. at 111-12." LeBlanc, 143 F.3d at 757.

There can be no doubt that plaintiffs are prevailing parties under this standard. As described above, this litigation has resulted in a settlement agreement that substantially overhauls the treatment of prisoners with mental illness at two large state prisons. These are precisely the kind of "excellent results" that the Supreme Court has said should result in "a fully compensatory fee." Hensley, 461 U.S. at 435.[4]

Since the Supreme Court's decision in Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598 (2001), to be considered a prevailing party, "a plaintiff must not only achieve some material alteration of the legal relationship of the parties, but that change must also be judicially sanctioned." Roberson v. Giuliani, 346 F.3d 75, 79-80 (2d Cir. 2003) (internal quotation marks omitted). That requirement is amply satisfied in this case.

Roberson involved a case brought under § 1983 that was resolved through a private settlement agreement. Pursuant to the agreement, the case was dismissed with prejudice, and the district court retained jurisdiction to enforce the settlement agreement. Id. at 78. The Second Circuit held that "the district court's retention of jurisdiction over the Agreement in this case provides sufficient judicial sanction to convey prevailing party status on plaintiffs." Id. at 84.

This case is materially indistinguishable from Roberson. Here, as in Roberson, the case was dismissed with prejudice, with the Court "RETAIN[ING] JURISDICTION

---

[4] The Prison Litigation Reform Act (PLRA) places various limitations on attorney fees in cases "brought by a prisoner." See 42 U.S.C. § 1997e(d). Since neither of the plaintiffs here is a "prisoner," these limits have no application to this case.

over this action for the purposes of enforcing any of the terms or conditions of the parties' Settlement Agreement." Order of Dismissal, Sept. 26, 2005 (hereinafter "Dismissal Order"); compare Roberson, 346 F.3d at 78 (same). Indeed, the degree of "judicial sanction" of the Settlement Agreement in this case exceeds that in Roberson. Here, unlike in Roberson, the Dismissal Order explicitly incorporated "all terms and conditions of the parties' Settlement Agreement," and "APPROVED" those terms and conditions. Compare Roberson, 346 F.3d at 78, 82 (dismissal order did not incorporate settlement agreement, and district court did not approve its terms).

## II.     The billing rates sought by plaintiffs' counsel are reasonable.

The calculation of a reasonable fee to be awarded to a prevailing plaintiff pursuant to § 1988 is based primarily on a "lodestar" figure, "which is arrived at by multiplying 'the number of hours reasonably expended on the litigation ... by a reasonable hourly rate.'" Gierlinger v. Gleason, 160 F.3d 858, 876 (2d Cir. 1998) (quoting Hensley v. Eckerhart, 461 U.S. at 433). In determining a reasonable hourly rate, the Court should look to market rates "'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" Id. at 882 (quoting Blum v. Stenson, 465 U.S. 886, 896 n. 11 (1984)). The relevant community is the judicial district in which the case was brought. Polk v. New York State Dept. of Corr. Services, 722 F.2d 23, 25 (2d Cir. 1983).

Not-for-profit organizations like the American Civil Liberties Union are to be awarded the same market rates that are appropriate for attorneys of comparable skill, experience, and reputation in the private market. As the Supreme Court held in Blum v. Stenson, "Congress did not intend the calculation of fee awards to vary depending on

whether plaintiff was represented by private counsel or by a nonprofit legal services organization." Blum, 465 U.S. at 894; id. at 895 ("The statute and legislative history establish that 'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel").

Where, as here, litigation spans a number of years, current rather than historical market rates are used to establish a reasonable hourly rate. See Gierlinger, 160 F.3d at 882 ("in order to provide adequate compensation where the services were performed many years before the award is made, the rates used by the court to calculate the lodestar should be 'current rather than historic rates'") (quoting Missouri v. Jenkins, 491 U.S. 274, 284 (1989)). As the Supreme Court observed in Jenkins, "compensation received several years after the services were rendered ... is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings." 491 U.S. at 283 (footnote omitted).[5]

The hourly billing rates of plaintiffs' counsel are as follows: Nancy B. Alisberg, a 1983 law school graduate, $350; Ben A. Solnit, a 1984 law school graduate, $340-$365; David C. Fathi, a 1988 law school graduate, $340; and Annette Lamoreaux, a 1990 law school graduate, $330. The experience and qualifications of these attorneys are set forth in their respective declarations, filed herewith.

The billing rates of attorneys Alisberg, Solnit, Fathi, and Lamoreaux are comparable to, or lower than, rates charged in this judicial district by lawyers of similar

---

[5] Despite this entitlement to compensation at current rates, attorney Ben A. Solnit has billed all time expended prior to July 1, 2005 at historical rather than current rates. Solnit dec., ¶ 6.

experience and qualifications.  See Solnit dec., ¶ 6; Lamoreaux dec., ¶ 6; Alisberg dec., ¶ 6; affidavit of Antonio Ponvert III, ¶ 7.  They are thus "reasonable hourly rates" appropriate for use in calculating a reasonable attorney fee.[6]

### III. The participation of the National Prison Project was essential to the prosecution of this case.

Plaintiffs seek compensation for the time of attorney David C. Fathi of the ACLU National Prison Project (NPP), based in Washington, DC.  "It has long been the policy of this circuit to permit out-of-state lawyers who specialize in areas of federal law such as FELA to work with local counsel on a plaintiff's federal claim."  Santa Maria v. Metro-North Commuter R.R., 81 F.3d 265, 274 (2d Cir. 1996).

As set forth above, attorney Fathi's billing rate is comparable to, or lower than, rates charged in the District of Connecticut by lawyers of similar background and experience.  Ponvert dec., ¶ 7.  But even were the Court to find Mr. Fathi's rate higher than those that are customary in this judicial district, plaintiffs would be entitled to compensation for Mr. Fathi's time at Washington, DC rates.

While fee awards under § 1988 are normally determined with reference to market rates in the forum district, "[e]xceptions have been made upon a showing that the special expertise of counsel from a distant district is required."  Polk, 722 F.2d at 25 (citing cases).  Where the participation of out-of state counsel is necessary to the litigation, that counsel is entitled to be compensated at hourly rates that prevail in the jurisdiction where he maintains his office, and to be compensated for travel time to and from the forum jurisdiction.  See U.S. ex rel. Poulton v. Anesthesia Associates of Burlington, Inc., 87

---

[6] In the exercise of billing judgment, plaintiffs do not seek compensation for attorney Alisberg's time.

F.Supp.2d 351, 356-57 (D.Vt. 2000) (compensating out-of-state counsel at higher hourly rates, and compensating them for travel time, when "retention of out-of-state counsel was feasibly necessary for the purpose of consultation on the more complex … aspects of this case").

The participation of the National Prison Project was essential to the successful prosecution of this case. Federal courts have repeatedly recognized the unique expertise of the NPP in prison conditions litigation. See, e.g., Plyler v. Evatt, 902 F.2d 273, 278-79 (4th Cir. 1990) (noting special expertise of NPP staff); Palmigiano v. Garrahy, 707 F.2d 636, 637 (1st Cir. 1983) (finding that NPP staff "had unique competence in the subject matter of this litigation"). According to Philip D. Tegeler, a civil rights litigator practicing in Connecticut since 1984, it is "virtually impossible" to find Connecticut counsel to litigate injunctive challenges to prison conditions unless they have the assistance of specialists such as those at the NPP. See Tegeler dec., ¶¶ 9-10. Attorney Tegeler, who was involved in the early stages of this litigation, further states that he was unable to find Connecticut counsel to bring this case until he secured the participation of the NPP. Id., ¶¶ 11-12. See also id., ¶ 13 (describing attorney Fathi's "crucial role" in the litigation, including his "key relationships with national experts" and his experience with "supermax" prisons in other states).

Because the assistance of the NPP was necessary, plaintiffs are entitled to recover attorney fees for Mr. Fathi's work at Washington, DC rates. See Poulton, supra. The hourly rate sought for Mr. Fathi's time is comparable to, or lower than, rates charged by Washington lawyers with comparable experience and qualifications. See Alexander dec., ¶ 9 and Exh. 1; see also Fathi dec., ¶ 9 and Exh. 1 (curriculum vitae).

**IV.    The hours sought by plaintiffs' counsel are fully compensable.**

In Hensley v. Eckerhart, 461 U.S. 424 (1983), the Supreme Court held that "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation." Id. at 435. The Court cautioned that "a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." Id.

Reiterating these principles, the Second Circuit has made clear that when the plaintiff has obtained substantial relief and the claims are interrelated, fees should be awarded for all hours reasonably expended. "[I]f the plaintiff won substantial relief, and all of his claims for relief 'involved a common core of facts' or were 'based on related legal theories,' so that 'much of counsel's time was devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis,' there should be a fee award for all time reasonably expended." LeBlanc-Sternberg, 143 F.3d at 762 (quoting Hensley, 461 U.S. at 435) (brackets omitted).

Under these principles, the comprehensive relief obtained by plaintiffs in this case entitles them to compensation for all hours expended on the litigation. Nevertheless, in the exercise of billing judgment, plaintiffs' counsel have not sought compensation for a number of hours that are otherwise compensable. See Fathi dec., ¶ 7; Solnit dec., ¶ 4;

Lamoreaux dec., ¶ 5. Indeed, plaintiffs have no-charged *all* of the time spent by attorney Nancy Alisberg, a total of over 80 hours. See Alisberg dec., ¶¶ 4, 7.[7]

Antonio Ponvert III is a lawyer with extensive experience litigating civil rights actions on behalf of prisoners. Ponvert dec., ¶ 8. He is familiar with this litigation; with the SA; and with the proceedings that followed the signing of the SA in March 2004 and culminated in this Court's approval of the SA in September 2005. Id., ¶ 9. After examining the billing records of plaintiffs' counsel he opines that "the hours for which plaintiffs' counsel currently seek compensation were reasonable and necessary to the effective representation of the plaintiffs in this case." Id., ¶ 11.

Indeed, the reasonableness of the fees now sought is obvious when they are compared to the settlement of plaintiffs' prior fee claim. In the SA, the defendants agreed to settle plaintiffs' claim for fees and costs for the seven-month period between August 2003 and March 2004 for $190,981.16. SA at 19. By contrast, for more than eighteen months of work between March 2004 and September 2005, plaintiffs now seek a total of $184,488.19.

## V.    The expenses sought by plaintiffs are recoverable.

Plaintiffs seek reimbursement for out-of-pocket costs including postage, long-distance telephone charges, photocopies, travel, electronic legal research, and the like. It is well settled that "[i]dentifiable, out-of-pocket disbursements for items such as photocopying, travel, and telephone costs are generally taxable under § 1988." Kuzma v. Internal Revenue Service, 821 F.2d 930, 933-34 (2d Cir. 1987); see also Arbor Hill

---

[7] Throughout this litigation, defendants have been represented by at least three lawyers: Assistant Attorneys General Terrence O'Neill, Ann Lynch, and Steven Strom. With the deletion of attorney Alisberg's time, plaintiffs similarly seek compensation for the work of three lawyers.

Concerned Citizens Neighborhood Ass'n v. County of Albany, 369 F.3d 91, 97-98 (2d

Cir. 2004) (computerized legal research costs are compensable under fee-shifting

statutes). The expenses plaintiffs seek are of a kind that are routinely billed to private

clients. See Solnit dec., ¶ 7; Alexander dec., ¶ 10. Accordingly, these expenses are

recoverable.

## VI.    The SA's compromise of some of plaintiffs' fee claims does not affect other fee claims not mentioned in the SA.

As already mentioned, in executing the Settlement Agreement on March 8, 2004,

the parties reached a settlement of plaintiffs' attorney fees and costs "incurred in this case

to date." SA at 19, ¶ B.18. The parties also agreed to a future limit on "plaintiffs'

entitlement to attorneys' fees *for monitoring and enforcement of this agreement*." SA at

3, ¶ A.12 (emphasis added); see also id. at 19, ¶ B.18. Obviously, plaintiffs' counsel

could not perform any "monitoring and enforcement" of the SA until that agreement was

enforceable. By its terms, the SA did not become effective until "the date of the filing of

the Court's Order of Dismissal" – that is, September 26, 2005. SA at 2, ¶ A.6; see also

Fathi dec., Exh. 12 (May 9, 2005 letter from defendants' counsel stating that "the

agreement is not yet in effect other than the DMHAS evaluation and transfer process that

we chose to commence early," and that "defendants' decision to begin to perform certain

of their obligations" does not "redefine the 'effective date of the agreement' as that

phrase is defined in section A.6 of the settlement agreement").

In short, plaintiffs settled their claim for fees incurred through March 8, 2004, and

agreed to limits on their fees "for monitoring and enforcement" of the SA after it became

enforceable, which occurred on September 26, 2005. These agreements in no way affect

plaintiffs' entitlement to fees for services performed between those two dates. On the

14

contrary, under Circuit precedent, the fact that the SA compromises *some* of plaintiffs'

fee claims makes clear that others are unaffected:

> [T]he parties specified which "costs" were waived by virtue of the settlement: those sought by the District pursuant to Rule 11 and §1927. Given that the parties specified with particularity that some costs were covered by their agreement, we find it difficult to conclude that the settlement manifested an unspoken intent to waive any costs *not* mentioned – in this instance, plaintiffs' attorneys' fees pursuant to § 1988.

Valley Disposal v. Central Vermont Solid Waste, 71 F.3d 1053, 1058 (2d Cir. 1995)

(emphasis in original).

## CONCLUSION

For all the reasons set forth herein, the Court should award plaintiffs their

reasonable attorney fees in the amount of $181,684.80, and their reasonable costs in the

amount of $2,803.39.

RESPECTFULLY SUBMITTED:

THE PLAINTIFFS,

STATE OF CONNECTICUT
OFFICE OF PROTECTION & ADVOCACY, et al.

BY: _____
Ben A. Solnit-ct00292
Tyler Cooper & Alcorn, LLP
205 Church Street
P.O. Box 1936
New Haven, CT  06509-1910
Tel. No.: 203.784.8200
Fax. No.: 203.777.1181
E-Mail:  solnit@tylercooper.com

Nancy B. Alisberg-ct21321
Office of Protection & Advocacy
60-B Weston Street
Hartford, CT  06120
Tel. No.: 860.297.4300
Fax. No.:  860.566.8714
E-Mail:  nancy.alisberg@po.state.ct.us

David C. Fathi-ct22477
ACLU National Prison Project
915 15th St. N.W., 7th Floor
Washington, D.C. 20005
Tel. No.: 202.393.4930
Fax. No.: 202.393.4931
E-Mail: dfathi@npp-aclu.org


Annette Lamoreaux-ct25769
Connecticut Civil Liberties Union
Foundation
32 Grand Street
Hartford, CT 06106
Tel. No.: 860.247.9823-Ext. 211
Fax. No.: 860.728.0287
E-Mail: annettel@cclu.org
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been mailed this 11th day of

October, 2005, to the following counsel of record:

Terrence M. O'Neill, Esq.
Ann E. Lynch, Esq.
Steven R. Strom, Esq.
Assistant Attorneys General
Office of the Attorney General
110 Sherman Street
Hartford, CT 06105
**Attys. for Defendants.**

Nancy B. Alisberg-ct21321
Office of Protection & Advocacy
60-B Weston Street
Hartford, CT 06120
Tel. No.: 860.297.4300
Fax. No.: 860.566.8714
E-Mail: nancy.alisberg@po.state.ct.us
**Attorney for Plaintiffs.**

David C. Fathi-ct22477
ACLU National Prison Project
915 15th St. N.W., 7th Floor
Washington, D.C. 20005
Tel. No.: 202.393.4930
Fax. No.: 202.393.4931
E-Mail: dfathi@npp-aclu.org
**Attorney for Plaintiffs.**

Annette Lamoreaux-ct25769
Connecticut Civil Liberties Union
Foundation
32 Grand Street
Hartford, CT 06106
Tel. No.: 860.247.9823-Ext. 211
Fax. No.: 860.728.0287
E-Mail: annettel@cclu.org
**Attorney for Plaintiffs.**

Ben A. Solnit-ct00292



**EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| STATE OF CONNECTICUT OFFICE OF  : <br>   PROTECTION AND ADVOCACY       : <br>   FOR PERSONS WITH DISABILITIES;  : <br> JAMES MCGAUGHEY, Executive      : <br>   Director, Office of Protection and    : <br>   Advocacy for Persons with Disabilities, : | Civil Action No. 3:03CV1352 (RNC) |

STATE OF CONNECTICUT OFFICE OF   :   Civil Action No.  3:03CV1352 (RNC)
  PROTECTION AND ADVOCACY       :
  FOR PERSONS WITH DISABILITIES;  :
JAMES MCGAUGHEY, Executive      :
  Director, Office of Protection and    :
  Advocacy for Persons with Disabilities, :

        Plaintiffs,           :

        v.                 :

WAYNE CHOINSKI, Warden,      :
  Northern Correctional Institution,    :
  in his official capacity;         :
GIOVANNY GOMEZ, Warden,      :
  Garner Correctional Institution,     :
  in his official capacity; and      :
THERESA C. LANTZ, Commissioner,  :
  Connecticut Department of Correction, :
  in her official capacity;        :        MARCH 8, 2004
                         :

        Defendants.       :

# SETTLEMENT AGREEMENT

## A.   GENERAL PROVISIONS

1.  This settlement agreement is entered into by the parties to resolve all of the claims made in this action, wherein the plaintiffs, Office of Protection and Advocacy for Persons with Disabilities ("OPA") and James McGaughey, bring a number of claims relating to the conditions of confinement of inmates housed at the Northern Correctional Institution and Garner Correctional Institution.

2.  In entering this agreement, the parties agree and represent that this agreement is fair, reasonable and adequate to protect the interests of all parties and, with respect to the population served by the plaintiffs, that in the opinion of OPA, entering into this agreement is in the best interests of prisoners and detainees with mental illness, who may develop mental illness, or who are at risk of developing mental illness, who are confined

at Northern CI and Garner CI. The parties further agree and represent that the terms and conditions of this agreement do not constitute "prospective relief" within the meaning of 18 U.S.C. § 3626.

3. This settlement agreement is not to be construed as a Consent Judgment or as an adjudication on the merits of this litigation. The defendants deny the allegations in this lawsuit and do not admit liability. By entering into this settlement agreement, the defendants do not concede that their past policies and practices violate any state or federal laws, deprive any inmates of their state or federal constitutional rights, or were otherwise inadequate. Moreover, the parties acknowledge that the policies and procedures outlined herein do not define clearly established constitutional rights of inmates or create any private right of action against the State of Connecticut, its agents, employees and/or representatives.

4. By entering into this agreement, the defendants do not waive, and are not authorized to waive, the sovereign immunity of the State of Connecticut or the State's immunity from suit guaranteed by the Eleventh Amendment.

5. This settlement agreement is binding upon the plaintiffs, the plaintiffs' successors in office, employees and agents, the defendants named in this lawsuit, and on the defendants' successors in office, employees and agents.

6. Except where otherwise provided, the Defendants shall be obligated to perform their obligations under this settlement agreement upon the date of the filing of the Court's Order of Dismissal of this matter. The date of the filing of the Court's Order of Dismissal shall hereafter be referred to as the "effective date" of the agreement.

7. The parties shall request that the Court, in its Order of Dismissal, incorporate the terms of this Agreement, thereby making "the parties' obligation to comply with the terms of the Settlement Agreement ... part of the order" consistent with the holding in Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 381 (1994). The parties agree that, after the Court issues such an order, it shall have jurisdiction and authority to enforce this Agreement only as set forth in paragraph A.13, and subject to the termination provisions in paragraph B. 17. See Id.; Scelsa v. City University of New York, 76 F. 3d 37, 40 (2d Cir. 1996).

8. Prior to the filing of any motion challenging the adequacy of the defendants' compliance with the terms and conditions of this agreement, the plaintiffs shall first notify the Commissioner of the Department of Correction, defendants' counsel and the appropriate consultants described in paragraph B.17 in writing, detailing the nature of the breach and the proposed remedy, with specific reference to the enumerated paragraphs in this agreement that are alleged to have been breached. The consultants shall meet and confer as soon as possible regarding the claim of noncompliance and shall convey their recommended resolution of the claim to the parties within 30 days of receipt of the claim. If the consultants are unable to agree upon a recommended resolution, they shall select, by mutual agreement and within 15 days, a neutral expert to arbitrate the claim as set

forth in paragraph B.17 and shall convey the resulting recommended resolution of the claim to the parties within 30 days of said neutral expert's receipt of the claim. If the parties do not agree with the consultants' recommended resolution, they shall meet and confer within 10 days of the date of the consultants' recommendation.

9. In the event the defendants do not comply with or are unable to comply with the consultant's recommended resolution within 10 days of the parties' meeting and conference described in paragraph A.8., the parties shall contact the appropriate magistrate judge and meet with the court in an effort to resolve any dispute with respect to the defendants' compliance with this agreement. No motion or other proceeding seeking enforcement of this agreement shall be filed or otherwise initiated until the parties have exhausted their discussions with the magistrate judge.

10. The plaintiffs may bring an action to enforce this agreement solely upon a pattern of noncompliance. Individual, isolated instances of noncompliance shall not be sufficient grounds for an enforcement action.

11. If, after exhausting the mandatory, informal resolution process outlined above in paragraphs A.8. and A.9., the plaintiffs file a motion seeking an order to enforce any portion of this agreement, the plaintiffs' request for relief must be limited to specific performance. No money damages may be sought. The plaintiffs shall not seek an order of contempt unless and until (1) the plaintiffs have sought to enforce this agreement by filing an appropriate motion with the court and (2) the court has issued a clear and unambiguous order of specific performance to the defendants. Before an order of contempt is issued, the court shall find by clear and convincing evidence that the defendants did not diligently attempt in a reasonable manner to substantially comply with the court's clear and unambiguous order.

12. Plaintiffs' entitlement to attorneys' fees for monitoring and enforcement of this agreement shall be limited to the three year effective term of this agreement, and shall be limited to the hourly rates permitted under the Prison Litigation Reform Act. In no event shall plaintiffs' entitlement to attorneys' fees for monitoring and enforcement exceed $20,000 in any calendar year for attorney's fees and $5,000 a year for plaintiff's monitoring and enforcement expenses.

13. After the Court adopts this settlement agreement, the Court's jurisdiction over the matters set forth in this litigation shall be limited, and specifically, the Court shall retain jurisdiction solely to ensure that the defendants have fulfilled the obligations undertaken in this settlement agreement. If the plaintiffs have reasonable cause to believe that the defendants have failed to substantially perform any obligation undertaken in this settlement agreement, they may follow the procedures for seeking enforcement as set forth in paragraphs A.8. – A.11. herein. At any hearing regarding the issue of the defendants' compliance with the terms of this agreement, plaintiffs shall have the burden of proving that the defendants have a pattern of failing to substantially comply with one or more of the terms of this agreement. If, after hearing, the Court finds that the defendants have failed to substantially comply, the sole remedy shall be an order

directing specific performance of the agreement herein. The Court shall apply Connecticut state contract law in deciding any motion seeking specific performance. For purposes of this agreement, "substantially comply" and "substantial compliance" mean that the defendants are in compliance with the terms of this agreement in all material respects.

14. Only the plaintiffs named in this agreement or James McGaughey's successors in office shall have standing to file a motion seeking enforcement of any of the terms and conditions of this agreement. This agreement does not confer, and is not intended to confer, any rights upon any other party. The parties to this agreement expressly acknowledge that there shall be no third party beneficiaries to this agreement. Further, any consultants appointed by the parties to audit compliance with this agreement shall have no authority to initiate any proceedings with the court. Only the parties are authorized to initiate proceedings with the court.

15. This agreement in no way waives or otherwise affects, limits or modifies the obligations of inmates to comply with the exhaustion requirements of the Prison Litigation Reform Act, the administrative directives of the Department of Correction or any current or future state or federal law governing the rights and obligations of incarcerated persons.

16. Nothing in this agreement shall require or permit the defendants to violate the laws of the State of Connecticut or the United States of America, nor violate any terms or conditions of any collective bargaining agreements to which the State of Connecticut is or becomes a party. "Laws of the State of Connecticut or the United States of America" are state and federal constitutional provisions, statutes, judicial decisions, Rules of Court and regulations of administrative agencies.

17. The defendants agree that at the present time they are not aware of any conflict between this Agreement and the Laws of the State of Connecticut or any presently existing collective bargaining agreements to which the State is a party. The Commissioner and other policy-making officials of the Department of Correction further agree that they will not seek any new Laws or the execution of new collective bargaining agreements, or any changes or amendments to existing Laws or collective bargaining agreements, that would undermine the obligations undertaken in this Agreement. Nothing in this section shall affect the Department of Correction's ability to defend litigation brought against it, to pursue all litigation options and to exhaust all appeal rights. If, in the future, there arises a conflict between the defendants' obligations under this Agreement and any Laws of the State of Connecticut or collective bargaining agreement, the defendants may follow the laws of the State of Connecticut or collective bargaining agreement, and they shall promptly notify counsel for the plaintiffs of the perceived conflict. In the event that the defendants, due to such a claimed conflict, cease compliance with any provision of this Agreement, the plaintiffs may seek to enforce this Agreement or may seek reformation of the Agreement to address such cessation of compliance. Compliance with any law or collective bargaining provision that is determined by the court to conflict with defendants' obligations under this Agreement

shall be a complete defense to a claim of noncompliance with this Agreement. Prior to instituting any such enforcement or reformation action, the plaintiffs shall notify the defendants, and the parties shall meet with the Court. The provisions of A.8. – A.11. do not apply in these circumstances. The defendants shall continue in full compliance with all provisions of this Agreement that are not affected by the purportedly conflicting Law or collective bargaining agreement.

18. Nothing in this agreement shall be construed to limit, in any way, the authority of the Commissioner of the CDOC to transfer inmates to other state or federal jurisdictions and/or to a private prison.

## B. SPECIFIC PROVISIONS

## 1. Definitions

"CDOC" means the Connecticut Department of Correction, UConn Correctional Managed Health Care, and their employees, contractors, and agents.

"Congregate programming" means programming in which the prisoner interacts with other prisoners.

"Consultants" means the consultants provided for in paragraph B.17.

"DMHAS" means the Connecticut Department of Mental Health and Addiction Services.

"Designated housing unit for the mentally ill" means the IPM, IMHU, F Block, G Block, and H Block at Garner Correctional Institution, the observation cells at NCI, as well as any housing unit that may hereafter be established at GCI or NCI where prisoners are housed due to mental illness or impairment.

"Doctoral-level clinician" means a licensed psychiatrist, or a licensed psychologist with a Ph.D., Psy.D., or Ed.D. degree.

"Exigent circumstances" means circumstances under which the doing of an act otherwise required by this Agreement would create an unacceptable risk to the safety of any person. Whenever an act otherwise required by this Agreement is excused on account of "exigent circumstances," defendants shall attempt to resolve the "exigent circumstances" as soon as possible, and the act shall be performed as soon as possible after the "exigent circumstances" cease to exist.

"GCI" means Garner Correctional Institution.

"IMHU" means the Intensive Mental Health Unit at Garner Correctional Institution.

"IPM" means the Inpatient Mental Health unit at Garner Correctional Institution.

"NCI" means Northern Correctional Institution.

"Observation" means that an inmate has been removed from a housing unit at NCI and admitted to an observation cell in the NCI medical unit because of mental health concerns.

"Prisoner housed in a designated housing unit for the mentally ill" does not include a prisoner whom a doctoral-level clinician has certified in writing is housed in such a unit for reasons unrelated to that prisoner's mental health.

"Programming" means therapeutic, educational, recreational, work, or other activities.

"Qualified Mental Health Professional" and "Practitioner" mean psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients. (Taken from NCCHC Standard J-E-05 Re: Mental Health Screening and Evaluation).

"Serious assault" means intentionally striking, attacking or attempting to strike or attack a Department of Correction employee, another inmate or any other person, with or without the use of an object or substance (Taken from DOC Code of Penal Discipline, A.D. 9.5.12 C & D).

"Seriously mentally ill" has the meaning set forth in Appendix A hereto.

## 2.    Scope of Agreement

Except as specified in paragraph B.4. below, this Agreement applies only to prisoners housed at GCI and NCI.

## 3.    Removal of the Seriously Mentally Ill from NCI

Persons who are subject to the DMHAS evaluation process set forth in Appendix B hereto and meet the definition of "Seriously Mentally Ill", as defined in Appendix A hereto, shall be removed from NCI within ten business days of receipt of DMHAS' report, absent exigent circumstances. If the removal of a prisoner is delayed because of "exigent circumstances," defendants shall attempt to resolve the "exigent circumstances" as soon as possible, and the prisoner shall be removed as soon as possible after the "exigent circumstances" cease to exist.

## 4.    Exclusion of the Seriously Mentally Ill from NCI's Administrative Segregation Program

Any prisoner being considered for transfer to NCI for placement in the administrative segregation program shall be evaluated by a licensed doctoral-level clinician, or by a qualified mental health professional if a licensed doctoral-level clinician is not available,

to determine whether the prisoner is seriously mentally ill. Absent exigent circumstances or the unavailability of a qualified mental health professional, the evaluation will take place prior to the transfer of the inmate to NCI's administrative segregation program. In the event there was no pre-transfer evaluation, or if the prisoner was not evaluated by a licensed doctoral-level clinician prior to transfer, then an evaluation by a licensed doctoral-level clinician shall be completed by the end of the third business day after the inmate's transfer to NCI's administrative segregation program. The evaluation shall include, at a minimum, review of the prisoner's medical and mental health files, and custody data, and a face-to-face interview with the prisoner, conducted in a private, confidential setting. For any prisoner being considered for transfer to NCI's administrative segregation program or transferred to NCI's administrative segregation program under this paragraph, defendants shall make a good faith effort to obtain records from any pre-incarceration psychiatric hospitalization, and any such records, if obtained, shall be reviewed by the doctoral-level clinician as part of the evaluation. If the prisoner is found to be seriously mentally ill, he shall not be transferred to or kept at NCI's administrative segregation program , except as set forth below:

1. Absent exigent circumstances, no seriously mentally ill prisoner shall be transferred to the administrative segregation program at NCI without prior notice to plaintiffs. If defendants wish to transfer a seriously mentally ill prisoner to the administrative segregation program at NCI, they shall give plaintiffs at least ten days' advance notice of the proposed transfer, unless exigent circumstances make such notice impracticable.

2. No seriously mentally ill prisoner shall be housed in the administrative segregation program at NCI unless defendants have produced a report to plaintiffs that

   a. provides documentation of the prisoner's dangerousness;
   b. describes all potential alternative placements, both in Connecticut and outside the state, that defendants have considered for the prisoner, and explains why none of them is workable; and
   c. identifies the additional services that will be provided to the prisoner if he is transferred to NCI, to help him with his serious mental illness and to mitigate the effect the conditions at NCI have on that illness.

If a prisoner housed at NCI in the administrative segregation program is found to be seriously mentally ill, that prisoner shall be removed from NCI within 10 days of that finding unless exigent circumstances warrant otherwise. If the removal of a prisoner is delayed because of "exigent circumstances," defendants shall attempt to resolve the "exigent circumstances" as soon as possible, and the prisoner shall be removed as soon as possible after the "exigent circumstances" cease to exist.

A prisoner who has been deemed unsuitable for transfer to NCI and placement in the administrative segregation program because he is seriously mentally ill, or has been removed from NCI's administrative segregation program because he is seriously mentally

ill, shall not thereafter be transferred to NCI and placed in the administrative segregation program unless (a) the dangerousness exception set forth in point 2. above applies or (b) unless more than four months have passed since the prisoner was found to be seriously mentally ill; a UCONN doctoral-level clinician has determined, after appropriate evaluation, that the prisoner is not currently seriously mentally ill and is not likely to become seriously mentally ill if transferred to NCI; and these findings are confirmed by an independent evaluation performed by a doctoral-level clinician from DMHAS selected by the parties. In the event the UCONN doctoral level clinician and the DMHAS doctoral level clinician disagree, the Commissioner of the DOC ("Commissioner") may transfer the prisoner to NCI and place him in the administrative segregation program if the Commissioner explains in writing why he/she disagrees with the conclusion of the independent DMHAS evaluation and agrees with the finding by the UCONN clinician that the inmate is not seriously mentally ill and is not likely to become seriously mentally ill if transferred to NCI and placed in the administrative segregation program. Conversely, if the Commissioner agrees with the evaluation done by the DMHAS clinician, the prisoner shall not be transferred to NCI and placed in the administrative segregation program. A copy of the written explanation will be sent to plaintiffs and to the consultants. A prisoner who is subject to this review process may be transferred to NCI and placed in the administrative segregation program pending the outcome of the review process; provided that in such cases, the initial determination shall take place within five days of that transfer, the independent evaluation shall take place within 10 days of the initial determination, and the Commissioner's review shall take place within five days of the independent evaluation. If the result of the review process is to transfer the prisoner back out of NCI's administrative segregation program, that transfer shall take place within five days of the completion of the review process. Defendants shall promptly notify plaintiffs and the consultants whenever a prisoner who has previously been found to be seriously mentally ill is transferred to NCI and placed in the administrative segregation program.

### 4.a.    Periodic Evaluations

Prisoners housed at NCI and in the administrative segregation program shall be evaluated not less than every 90 days by a doctoral-level clinician to determine whether their mental health is being adversely affected by confinement at NCI's administrative segregation program. This evaluation shall include, at a minimum, review of the prisoner's medical, mental health, and custody files, and a face-to-face interview with the prisoner, conducted in a private, confidential setting.

### 5.    Mental Health Staffing

CDOC shall employ at least I FTE psychiatrist, or the equivalent of 1 FTE psychiatrist, for each 150 prisoners who are prescribed psychotropic medications at GCI and NCI. Prisoners prescribed psychotropic medication by a M.D. for a reason other than for treating a mental health condition, shall not be included in this "150 prisoners" figure for staffing purposes provided however, that such prescriptions shall be subject to audit by the consultants as described below. For purposes of this section and section B.5.A.,

8