UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE OF CONNECTICUT OFFICE OF | : | Civil Action No.  3:03CV1352 (RNC) |
| PROTECTION AND ADVOCACY | : | |
| FOR PERSONS WITH DISABILITIES; | : | |
| JAMES MCGAUGHEY, Executive | : | |
| Director, Office of Protection and | : | |
| Advocacy for Persons with Disabilities, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| WAYNE CHOINSKI, Warden, | : | |
| Northern Correctional Institution, | : | |
| in his official capacity; | : | |
| GIOVANNY GOMEZ, Warden, | : | |
| Garner Correctional Institution, | : | |
| in his official capacity; and | : | |
| THERESA C. LANTZ, Commissioner, | : | |
| Connecticut Department of Correction, | : | |
| in her official capacity; | : | |
| | : | |
| Defendants. | : | May 17, 2006 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR RENEWED MOTION FOR AN ORDER
ALLOWING ACCESS TO PRISONER HEALTH RECORDS**

## I.     INTRODUCTION

Plaintiffs seek an order allowing limited access to prisoner health records, so that their consultants can monitor defendants' compliance with the Settlement Agreement in this case.   As set forth in plaintiffs' June 9, 2004 initial brief and July 27, 2004 reply brief, such an order is authorized by the Health Insurance Portability and Accountability Act ("HIPAA") and controlling federal law.   Plaintiffs incorporate by reference the arguments made in their earlier briefs and continue to rely on them.   Plaintiffs now make the following additional points in further support of their renewed motion.

II.   **ARGUMENT**

A.   **Plaintiff Office of Protection and Advocacy Is a Health Oversight Agency to which the Records can be Released Without Implicating Any Privilege Concerns**

During the April 28, 2005 telephonic discussion of plaintiffs' original motion, the Court asked defense counsel to explain the basis for the state's disclosure of prisoner health records to its outside mental health consultant: "How is it under the law that these individuals acting as consultants for the defendants are able to have access to this information. What authority do they rely on in order to have access themselves?" 4/28/05 Tr. at 9.[1]

The following colloquy then took place:

"MR. O'NEILL: Is Your Honor asking me did we believe that we did not – that we, the Department of Corrections, did not need to obtain consent from the inmates to disclose information to our consultant?

THE COURT: Right.

MR. O'NEILL: Okay.  That was our position, yes.

THE COURT:  And again just for the sake of clarification, that is because why?

MR. O'NEILL:  That is because under HIPAA, the consultant is a business associate.  There's an exception in there that allows for business associates to observe – to review records.

---

[1] A copy of cited portions of the transcript of discussion of plaintiffs' original motion is attached to this brief as Exhibit 1.

> And so because our consultant has been retained to assure compliance with this agreement and provide consultation services as to the quality of care provided, mental healthcare provided, she meets the definition."

4/28/05 Tr. at 11-12.

There is similarly an exception in HIPAA that allows disclosure of medical records without prior consent to a health oversight agency.

45 C.F.R. §164.512(d)(1) provides:

> A covered entity may disclose protected health information to a health oversight agency for oversight activities authorized by law, including audits… or other activities necessary for appropriate oversight of:…(iv) Entities subject to civil rights laws for which health information is necessary for determining compliance…

HIPAA defines a health oversight agency as meaning, inter alia,

> an agency or authority of…a State… or a person …acting under a grant of authority from or contract with such public agency… that is authorized by law to oversee… government programs in which health information is necessary to determine …compliance, or to enforce civil rights laws for which health information is relevant.

45 C.F.R. §164.501.

Plaintiff Connecticut Office of Protection and Advocacy for Persons With Disabilities ("OPA") is a State agency. See Conn. Gen. Stat. §46a-10. As the federally designated protection and advocacy agency for Connecticut, OPA is authorized by both federal and state law to enforce civil rights for which health information is relevant. See 42 U.S.C. §10801(b)(2)(A); Conn. Gen. Stat. §46a-11. OPA is thus a health oversight agency within the meaning of HIPAA. See Ohio Legal Rights Services v. The Buckeye Ranch, Inc., 365 F.Supp. 2d 877,

3

891-92 (S.D. Ohio 2005) (holding that Ohio Protection and Advocacy Agency is a "health oversight agency" under HIPAA).

Accordingly, just as the state allows its outside consultant access to prisoner health records under the business associate exception, OPA's outside consultant should be given access to these same records under the health oversight agency exception. As the state conceded, no privilege concerns are implicated by disclosure to someone who falls within an exception created by HIPAA. Plaintiffs' motion can and should be granted on this basis alone.

**B.     Requiring Releases Prevents A Meaningful Audit**

In urging the parties to perform the first audit cycle using records obtained by individual releases, the Court noted the lack of a record that would counter the privacy rights being asserted by defendants. See 4/28/05 Tr. at 31. The Court went on to say however:

> It seems to me that in undertaking to enter into this agreement, the defendants risked a court order that would give the plaintiffs' consultants some considerable access to this health information of the inmates, and even if that's not so, by entering into an agreement that contemplated some monitoring, I think the defendants committed themselves to permitting somebody access to some information in some way at some time in some form that would make monitoring meaningful. In other words, I don't think the defendants could say that in entering into the agreement both sides contemplated that the plaintiff would have to trust the defendants when it came to monitoring performance of the agreement. There had to be something more than that going on there, I would think.

4/28/05 Tr. at 33.

The Court told plaintiffs "to make a better record by exhausting alternatives such as the one the State has extended, and that is having your people visit with those individuals and ask for their consent." Id. at 32.

4

Finally, the Court also noted:

> If I had a record of non-compliance with the agreement, if there were articulable facts substantiated by evidence showing that there was a pattern of non-compliance and this was something that required the plaintiffs' consultant to be able to take a closer look, that would be a different record.

Id. at 31.

Plaintiffs did try the alternative suggested by the state of performing an audit using health records of only those prisoners who signed an individual release. As detailed in the attached declaration of Carl Fulwiler, M.D., Ph.D (Exhibit 2 hereto), plaintiffs' mental health consultant, that proved to be extremely problematic. While Dr. Fulwiler was able to document many areas of noncompliance,[2] he could not perform a complete audit.

Dr. Fulwiler was concerned at the outset that the most severely mentally ill prisoners would be likely to refuse to provide a release, especially those with paranoia. See Fulwiler Declaration, ¶5. This concern was well founded: four of the first eleven seriously mentally ill prisoners who were sent to NCI under the dangerousness exception refused to sign releases. Id. Dr. Fulwiler thus could not review their medical records, which in turn prevented any meaningful audit of their return to NCI. Id.

All mental health clinicians agree that insolated confinement is damaging to people with serious mental illness. Id., ¶6. Paragraph 4 of the Settlement Agreement provides for the exclusion of seriously mentally ill prisoners from NCI's administrative

---

[2] A copy of the mental health audit report is being filed, together with a motion to file under seal, as an exhibit to the transmittal declaration of Ben A. Solnit.

segregation program unless the prisoner is too dangerous to be placed anywhere else.[3] Pursuant to this exception, defendants had, by the time of Dr. Fulwiler's audit visit in late January, 2006, transferred to the administrative segregation program at NCI eleven seriously mentally ill prisoners. That number has now grown to 15. Id.

Prisoners who have paranoia are more likely to incur disciplinary infractions and accumulate extended sentences in segregated housing as a result of their serious mental illness. That the refusal rate for this group of eleven transferred prisoners was nearly half is therefore not surprising but it precluded any meaningful audit of their transfer to NCI despite being seriously mentally ill. Id., ¶7. This same pattern of refusal to sign releases by prisoners whom Dr. Fulwiler particularly wanted to include in his audit extended to other areas as well. Id.

Indeed, Dr. Newkirk and Dr. Fulwiler were unable to audit an entire area, item 23 of the mental health audit instrument, programming made available to prisoners at NCI, because of the lack of releases. See id. at ¶8.

When the auditors attempted to work around such problems by requesting redacted records, this led to long delays and unusable documents. Id. at ¶9.

Dr. Fulwiler concluded that while Dr. Newkirk and he had found many areas of noncompliance, id. at ¶3., (see Ex.1 to Solnit Declaration, noting 9 areas of noncompliance and 11 areas of only partial compliance), the obstacles created by the release requirement prevented him from performing a complete, meaningful audit. Id. at ¶10. Dr. Fulwiler was unable to check on the well being of the sickest prisoners, one of

---

[3] A copy of the Settlement Agreement is attached as Ex.1 to plaintiffs' June 9, 2004 brief in support of their original motion for an order allowing access to prisoner health records. A copy of amended paragraph A.13 of the Settlement Agreement, under which this renewed motion is brought, is attached hereto as Exhibit 3.

plaintiffs' central concerns. Id. Accordingly, the record requested by the Court has been created. There are clearly serious issues with defendants' compliance. Equally clearly, Dr. Fulwiler has been prevented by the release requirement from taking a closer look at important areas of concern to him.

## C.   Releases Are Largely Unnecessary Because Most of the Records at Issue Are Not Protected Under Jaffee

Further, releases are not even relevant to most of the records in question. The privilege created in Jaffee v. Redmond, 518 U.S. 1 (1996) covers only "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment..." 518 U.S. at 15 (emphasis added). There is a clear distinction drawn in the mental health field between therapy, which includes diagnosis and treatment, and evaluation. Fulwiler Declaration, ¶11. Further, there is a clear legal distinction between confidential communications and either forms of information.

Courts applying Jaffee have consistently held that the privilege does not apply if the information at issue is not "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment." See e.g., U.S. v. Schwensow, 942 F.Supp. 403-04 (E.D. Wis. 1996), aff'd, 151 F.3d 650 (7th Cir. 1998), cert. denied, 525 U.S. 1059 (1998). ("In recognizing the psychotherapist privilege and extending it to licensed social workers, the Supreme Court specifically held that the confidential communications were to be made in the course of psychotherapy"; defendant's discussion with AA volunteers did not qualify for protection under that test); Barrett v. Vojtas, 182 F.R.D. 177, 180-81 (W.D. Pa. 1998) (Jaffee did not protect

information created by examination ordered by officers employer; "we find that the psychotherapist-patient relationship which existed in the instant case was not the type of relationship contemplated when the privilege was recognized by the Supreme Court"); Phelps v. Coy, 194 F.R.D. 606, 607 (S.D. Ohio 2000), aff'd., 286 F.3d 295 (6th Cir. 2002), cert. denied., 537 U.S. 1104 (2003) ("records regarding psychiatric evaluations, reports, notes, documents and test scores" which were reported to officer's employer are not "confidential communications" under Jaffee) (emphasis in orignal); Merrill v. Waffle House, Inc., 227 F.R.D. 467, 471 (N.D. Tx. 2005) (Jaffee "protects only communications between the therapist and patient") (emphasis in original).

Here, only a tiny fraction of the records Dr. Fulwiler received through a release reflected confidential patient-psychotherapist communication in the course of diagnosis and treatment and those few records were easily segregable.  Fulwiler Declaration, ¶11. Thus, most of the records at issue are not protected under Jaffee.  Even if access to all prisoner health records is not ordered for the reasons argued above, at a minimum, access to all but these few records should be given.

## III.   **CONCLUSION**

Limited access to prisoner health records is necessary to a complete, meaningful

audit and is allowed under the law.  Plaintiffs' motion should therefore be granted.

THE PLAINTIFFS
STATE OF CONNECTICUT
OFFICE OF PROTECTION & ADVOCACY, et al.

BY _____
Ben A. Solnit – CT00292
Tyler Cooper & Alcorn, LLP
205 Church Street
P.O. Box 1936
New Haven, CT  06510
Tel. No.  203.784.8200
Fax. No. 203.777.1181
E-Mail:  bsolnit@tylercooper.com

Nancy B. Alisberg-ct21321
Office of Protection & Advocacy
60-B Weston Street
Hartford, CT  06120
Tel. No.: 860.297.4300
Fax. No.: 860.566.8714
E-Mail:  nancy.alisberg@po.state.ct.us

David C. Fathi-ct22477
ACLU National Prison Project
915 15th Street, NW, 7th Floor
Washington, D.C.  20005
Tel. No.: 202.393.4930
Fax. No.: 202.393.4931
E-Mail:  dfathi@npp-aclu.org

Renee C. Redman-ct16604
American Civil Liberties Union
Foundation of Connecticut
32 Grand Street
Hartford, CT  06106
Tel. No.: 860.247.9823-Ext. 211
Fax. No.: 860.728.0287
E-Mail:  rredman@acluct.org

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been mailed this 17th day of

May, 2006, to the following counsel of record:

Terrence M. O'Neill, Esq.
Ann E. Lynch, Esq.
Steven R. Strom, Esq.
Assistant Attorneys General
Office of the Attorney General
110 Sherman Street
Hartford, CT 06105
**Attys. for Defendants.**

Nancy B. Alisberg, Esq.
Office of Protection & Advocacy
60-B Weston Street
Hartford, CT 06120
Tel. No.: 860.297.4300
Fax. No.: 860.566.8714
E-Mail: nancy.alisberg@po.state.ct.us
**Attorney for Plaintiffs.**

David C. Fathi, Esq.
ACLU National Prison Project
915 15th Street, NW, 7th Floor
Washington, D.C. 20005
Tel. No.: 202.393.4930
Fax. No.: 202.393.4931
E-Mail: dfathi@npp-aclu.org
**Attorney for Plaintiffs.**

Renee C. Redman, Esq.
American Civil Liberties Union
Foundation of Connecticut
32 Grand Street
Hartford, CT 06106
Tel. No.: 860.247.9823-Ext. 211
Fax. No.: 860.728.0287
E-Mail: rredman@acluct.org
**Attorney for Plaintiffs.**

Ben A. Solnit – CT00292

# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - x
                                :
STATE OF CONNECTICUT            :   No. 3:03CV1352(RNC)
OFFICE OF PROTECTION & ADVOCACY :
FOR PERSONS WITH DISABILITIES   :
                                :
               Plaintiff        :
                                :
         vs.                    :
                                :
NORTHERN CORRECTIONAL INSTITUTE,:
    ET AL                       :
                                :   HARTFORD, CONNECTICUT
               Defendants       :   APRIL 28, 2005
                                :
- - - - - - - - - - - - - - - x
```

TELEPHONE CONFERENCE

BEFORE:

   HON. ROBERT N. CHATIGNY, CHIEF U.S.D.J.

Darlene A. Warner, RDR-CRR
Official Court Reporter

1    parties will submit to the Court the issues of ordering
2    the disclosure of prisoner health records to the
3    consultants.  It doesn't say the parties will argue
4    whether plaintiff has the right to have the consultants
5    see any documents without individual consents.

6         So the only thing that has been reserved by this
7    settlement agreement is the conditions under which the
8    parties' consultants, and really the plaintiffs'
9    consultants, because the defendants are using in one case
10   their own full-time employee and in another case a person
11   they've done an employment contract with.  So they have no
12   problem getting access.  But the plaintiffs in order to
13   adequately audit the settlement agreement need to have
14   access, and the only issue is under what terms that access
15   will be issued.

16        I agree we're beyond the complaint.

17        THE COURT:  Okay.  Let me ask a couple of
18   follow-up questions on this part of the problem.

19        How is it under the law that these individuals
20   acting as consultants for the defendants are able to have
21   access to this information?  What authority do they rely
22   on in order to have access themselves?

23        MR. O'NEILL:  We cited in our brief, Your Honor,
24   the Commissioner of Correction is the person responsible
25   for providing mental and medical healthcare, obviously is

1      We've now retained an outside person to perform

2   that function.  She provides additional consultive

3   services to the Department of Corrections.  While she's

4   not a direct employee, she's a contractor.  So she is an

5   advisor to the agency on mental health services.

6          THE COURT:  So -- and I'm not meaning to imply

7   by my questions that I have reason to disagree with what

8   you're saying, I'm just looking for information.

9          Is it your view that HIPAA would permit this

10  without any opportunity on the part of the inmate to

11  object?  In other words, under HIPAA, you were not obliged

12  to tell the inmates that their individually identifiable

13  mental health information would be given to people for

14  this purpose unless they objected?  You felt that HIPAA

15  would not require you to give notice in the first

16  instance, is that right?

17         MR. O'NEILL:  Is Your Honor asking me did we

18  believe that we did not -- that we, the Department of

19  Corrections, did not need to obtain consent from the

20  inmates to disclose information to our consultant?

21         THE COURT:  Right.

22         MR. O'NEILL:  Okay.  That was our position, yes.

23         THE COURT:  And again just for the sake of

24  clarification, that is because why?

25         MR. O'NEILL:  That is because under HIPAA, the

1    consultant is a business associate. There's an exception
2    in there that allows for business associates to observe --
3    to review records.

4          And so because our consultant has been retained
5    to assure compliance with this agreement and provide
6    consultation services as to the quality of care provided,
7    mental healthcare provided, she meets the definition.

8          THE COURT:  I see.

9          MR. SOLNIT:  Your Honor, Ben Solnit.

10         There's also a provision under HIPAA that allows
11   a covered entity such as DOC to disclose protected
12   healthcare information to a health oversight agency for
13   oversight activities including audits, and the definition
14   of the health oversight agency includes an agency of a
15   state acting under a grant of authority authorized by law
16   to enforce civil rights law for which health information
17   is relevant, and that's in the first part in allowing DOC
18   to disclose to OPA is 45 CFR 164.512(d).  And then the
19   definition of a health oversight agency is 45 CFR 164.5O1.

20         So it's plaintiffs' position even before you get
21   to qualified protective order in litigation, there is a
22   provision in HIPAA to allow this information to be
23   provided to our consultants.  Just like Mr. O'Neill
24   explained that there's a provision under HIPAA for the
25   business associate for his consultant, there's this other

1    privacy interest of the individual in these unusually

2    sensitive, delicate records.

3           Even assuming that a court has the authority to

4    engage in such a balancing, the record I have at the

5    moment doesn't give the plaintiffs' demand for

6    across-the-board access, the weight that I think would be

7    necessary to overcome the individual's privacy interest.

8           I grant you that if the OPA is a health

9    oversight agency, then there's no need for balancing, I

10   guess, and there's an exception there that can be

11   respected.  But even as to that, I'm not sure at the

12   moment.

13          Point is, I think the defendants rightly

14   emphasize that the individual does have a very strong

15   interest in maintaining the privacy of his or her mental

16   health records.  And I don't see a countervailing interest

17   at the moment.

18          If I had a record of non-compliance with the

19   agreement, if there were articulable facts substantiated

20   by evidence showing that there was a pattern of

21   non-compliance and this was something that required the

22   plaintiffs' consultant to be able to take a closer look,

23   that would be a different record.  But at the moment, it

24   seems to me you're asking me to find that the State's

25   willingness to enter into this settlement agreement

1   provides a sufficient basis for overriding the privacy
2   interests of all these individuals.  And for all I know,
3   the State decided to enter into a settlement agreement not
4   because the rights of these individuals have been or would
5   be violated but because it was interested in improving the
6   quality of mental healthcare and protecting people against
7   violations of their rights.  And for me to hold it against
8   the State, so to speak, at the expense of these
9   individuals who might well object to the blanket
10  disclosure of their records, is something that I don't
11  think I should do.

12          So I would urge you to see if there is a way to
13  narrow your request for access to maybe put conditions on
14  your access, to perhaps formulate a way of getting at
15  information that would allow you and your consultants to
16  get the substantive information without having access to
17  the records themselves.  Maybe you've done this to a fair
18  thee well and there's simply no other alternative.

19          If that's so, then I think I would ask you to
20  make a better record by exhausting alternatives such as
21  the one the State has extended, and that is having your
22  people visit with these individuals and ask for their
23  consent.  It may be that that's time consuming and
24  expensive, but I'm afraid I need to ask you to do that
25  before I can in effect nullify the privacy interests of

1    people who might well object.

2              So in light of all that we've discussed, in

3    light of all you've said in your papers, recognizing that

4    the plaintiff might well feel somewhat ill used, or

5    insulted even, I think that the Jaffee case does require

6    me to proceed this way.

7              If you can't come up with an alternative, if you

8    find yourselves looking for consents and not getting them

9    and you believe that in the absence of an order from me

10   the monitoring that you consider an essential part of this

11   agreement simply can't occur, then we can talk again.

12             It seems to me that in undertaking to enter into

13   this agreement, the defendants risked a court order that

14   would give the plaintiffs' consultants some considerable

15   access to this health information of the inmates, and even

16   if that's not so, by entering into an agreement that

17   contemplated some monitoring, I think the defendants

18   committed themselves to permitting somebody access to some

19   information in some way at some time in some form that

20   would make monitoring meaningful.  In other words, I don't

21   think the defendants could say that in entering into the

22   agreement both sides contemplated that the plaintiff would

23   have to trust the defendants when it came to monitoring

24   performance of the agreement.  There had to be something

25   more than that going on there, I would think.  And I'm

1

2

3                              C E R T I F I C A T E

4

5                           In Re: OPA v. NORTHERN

6

7

8              I, Darlene A. Warner, RDR-CRR, Official Court

9     Reporter for the United States District Court for the

10    District of Connecticut, do hereby certify that the

11    foregoing pages are a true and accurate transcription of

12    my shorthand notes taken in the aforementioned matter to

13    the best of my skill and ability.

14

15

16

17    _____

18                          DARLENE A. WARNER, RDR-CRR
                                 Official Court Reporter
19                            450 Main Street, Room #223
                               Hartford, Connecticut 06103
20                                 (860) 547-0580

21

22

23

24

25